LUCINDA WILLCOX, administratrix of Whitman Willcox, jun, deceased, *vs.* ELISHA B. SMITH and WHITMAN WILLCOX, administrators of Whitman Willcox, jun. deceased, and others.

WHITMAN WILLCOX, administrator, &c., *vs.* ELISHA B. SMITH, administrator, and LUCINDA WILLCOX, administratrix, &c., and others.

SHERWOOD S. MERRITT and MARY ANN his wife *vs.* ELISHA B. SMITH and others, administrators, &c., and others.

BRADFORD WILLCOX *vs.* THE SAME.

CHARLES WILLCOX, by Henry M. Hyde his special guardian, *vs.* THE SAME.

Upon an appeal from an order or decree of a surrogate, all persons to whom sums are awarded by the surrogate, and who are therefore interested in sustaining his decree, should be made parties respondents, in the petition of appeal; although they were not parties to the proceedings before the surrogate.

The creditors, whose debts a surrogate may direct the administrators to pay, on a final settlement of their accounts, are those whose claims arise on contracts made with the deceased; and not such as have demands against the administrators personally, by reason of agreements made between them and the administrators, even while the latter were in the proper discharge of their duties.

Where administrators employ counsel to assist them in arranging, substantiating and settling their accounts before the surrogate, on final settlement, they are personally liable to pay such counsel for their disbursements and services; and it is not in the power of such administrators to make an agreement with their counsel on which the latter can found any claim against the estate of the deceased.

Under such circumstances, the counsel are not creditors of the deceased; nor can they make any claim against his estate, for services thus rendered to the administrators.

Counsel, not being *parties* to proceedings before a surrogate on a final accounting, cannot have costs awarded to them; inasmuch as the statute only authorizes the surrogate to award costs to *parties*. And costs, when adjudged to a party, by the surrogate, are such, only, as were formerly allowed for similar services in the late courts of common pleas.

An executor or administrator is not entitled to charge the estate with a counsel fee paid by him upon the final settlement of his accounts before the surrogate; or for drawing up his accounts in a proper and legal form, on such a settlement. Nor has the surrogate any authority to make an arbitrary

Willcox *v.* Smith.

allowance to him in lieu of the compensation directed by the statute to be paid to advocates and proctors in surrogates' courts, where the same is to be paid as costs in the suit or proceeding, either by the adverse party, or out of the fund in litigation.

Where administrators took out letters of administration on the 1st of September, 1845, and although it was their duty to return an inventory of the personal estate within three months from that time, they had not even made oath to the accuracy of the inventory in 1852 when the next of kin commenced proceedings before the surrogate to compel them to return it; and they did not file their inventory, until the 5th of January, 1853, although there was no reasonable excuse for such delay; and their oaths, which they attached to the inventory, were contradictory, and varied from the requirements of the statute; two of them swearing that S. had been the *acting* administrator and that they made their oath as to the correctness of the inventory, from the best of their knowledge, information and belief, and under the advice of counsel that the same was not conclusive upon them; and S. swearing that he had but little knowledge of the property of the deceased, previous to his appointment as administrator; that all the notes, accounts &c. appraised, and most of the personal property, were in the possession of his co-administrators, or one of them, who had been the acting administrators, and that he, S., had not been, at any time, sole acting administrator, according to his best knowledge and belief; but that he supposed, at all times, the three were acting conjointly; and that he made his affidavit under the advice of counsel, and claimed that he was not concluded by the same; and it appeared that the administrators had been remiss in collecting debts due to the deceased, in paying those contracted by him, in converting the personal property into money, and in taking vouchers for moneys paid out by them; and that they had applied some of the personal estate to uses not authorized by law, and had unnecessarily permitted the same to decrease in their hands; *Held*, that it was not a case in which the surrogate should have allowed the administrators any costs whatever, out of the estate, on the final settlement of their accounts, beyond the fees of the auditor and himself.

*Held also*, that the contestants were entitled to costs, to be paid out of the estate of the deceased; and that the surrogate should have awarded costs to them.

The decision of a surrogate, awarding costs on the final settlement of the accounts of administrators, may be reviewed on appeal.

Where a note was made on the 31st of August, 1847, by which the maker promised to pay S. $1200 on demand, with interest, which remained unpaid at the death of the maker, and when letters of administration upon his estate were issued; and on the 31st of August, 1847, one of the administrators paid the interest then due on the note, and he continued to pay interest on it until 1852; *Held* that the inference was irresistible that S. presented the note to the administrators within seven years and a half next after its

date. and that they allowed it as a valid claim against the estate of the deceased.

*Held also,* that S.'s cliam upon such note having been duly recognized and allowed by the administrators as a valid claim against the estate, within seven and a half years from the time it became due, and their final accounting and settlement having been made within six years from the time of such allowance, *the next of kin could not require its rejection by the surrogate on the* plea of the statute of limitations. That under such circumstances neither they, nor the administrators, could set up the statute, against the claim.

Where no sufficient excuse is given, by administrators, for not paying a note of their intestate, within eighteen months from the time of their appointment, they should be charged *personally, by the surrogate, with all interest* that has accrued on it since the expiration of the eighteen months.

An executor or administrator who is the general guardian of an infant, cannot, of his own motion, transfer any portion of the personal estate of the deceased, in which his ward has an interest as next of kin or legatee, from himself as executor or administrator to himself as general guardian of the infant, so as to relieve himself from accounting for all of such personal estate, as executor or administrator, before the surrogate. He must keep, as executor or administrator, that portion of the estate which belongs to his ward, until he has authority from the surrogate to hold it as general guardian.

He cannot make any contract, as guardian, with himself as administrator, which will be binding on his ward. He cannot therefore give a receipt as guardian, to himself as administrator, which will be evidence against his ward, of the payment of the sum mentioned therein, by himself as administrator. The law will not permit him thus to act in a double capacity.

Upon the final accounting and settlement of executors or administrators, the next of kin to the deceased may set up the statute of limitations against the allowance of a claim presented by an administrator, for moneys alleged to have been paid by him upon a debt of the decedent.

Executors and administrators have no authority or control over the real estate left by the deceased, except to mortgage, lease or sell it for the payment of his debts, when specially authorized to do so by the surrogate. They are not warranted in paying any taxes on it, assessed subsequent to the death of the deceased, or in making payments upon mortgages, on real estate conveyed by him, or whereof he died seised, which he was under no personal obligation to pay.

An administrator, as such, has no right to purchase, with the funds of the estate, the interest of an individual, as next of kin, in the personal estate of the deceased, for his co-administrators, or for the heirs and next of kin; and his co-administrators have no power, even with the express consent of all the heirs and next of kin and their guardians, to authorize him to purchase, as administrator, the interests of another in either the real or the personal estate of the deceased. Nor has the surrogate power to authorize

Willcox *v.* Smith.

him to do it. Such a purchase is not an act which an administrator can do in his representative character. And he cannot be allowed the sum expended in making such purchase, on the settlement of his accounts.

The statute is imperative that every executor or administrator, in rendering his accounts to the surrogate, on a final settlement, *shall* produce vouchers for all debts and legacies paid, and for all funeral charges and just and necessary expenses. If an account can be allowed in any case, without vouchers and without proof other than the oath of the executor or administrator, where separate items of it exceed $20 in amount, *it seems* it is where creditors refuse to give vouchers; or where the executor or administrator has lost his vouchers; or where they have been stolen or destroyed, and he is unable to procure others.

Executors and administrators, being all equally liable, *prima facie*, to creditors and the next of kin, for the property mentioned in the inventory, are not competent witnesses for each other on their final accounting before the auditor and the surrogate.

They are not competent witnesses for each other under the common law rules of evidence, or the statutes relating to proceedings before surrogates; and the code of procedure has no application to proceedings in surrogates' courts.

Where administrators have given a joint bond, conditioned for the faithful performance of their trust, a surety in such bond is not a competent witness for the administrators, or either of them, on their final accounting.

The mode in which executors and administrators should make up their accounts.

THE above entitled causes are five appeals from the decree of the county judge of Chenango county, made by him while acting as surrogate of that county, on the 29th day of December, 1855, upon the final accounting and settlement of Lucinda Willcox, administratrix, and Elisha B. Smith and Whitman Willcox, administrators of the goods, chattels and credits of Whitman Willcox, jun. deceased.

Whitman Willcox, jun. died intestate, at Norwich, in the county of Chenango, on the 4th day of August, 1845. On the 1st day of September, in that year, the above named Lucinda Willcox, Elisha B. Smith and Whitman Willcox were appointed administratrix and administrators of the goods, chattels and credits of the deceased, by the county judge of Chenango county, acting as surrogate of that county; and on the same day such county judge, as surrogate, appointed appraisers of the personal property of the deceased. The

appraisers commenced taking an inventory of such property on the 8th day of September, 1845; but the inventory, which they made, was not sworn to by the administratrix and administrators until the 4th day of January, 1853. It was filed in the surrogate's office on the 5th day of January, 1853; but it was not sworn to or returned to the surrogate, until after some of the next of kin to the deceased instituted proceedings before the surrogate to compel the administratrix and administrators to file it. The inventory showed that the appraised value of the personal estate of the deceased exceeded $42,000. The deceased left surviving him, Lucinda Willcox his widow, Lucinda P. Smith, wife of Elisha B. Smith, Whitman Willcox, Eli H. Willcox, Mary Ann Willcox now wife of Sherwood S. Merritt, Gurdon H. Willcox, Bradford Willcox and Charles Willcox, his sons and daughters and only heirs at law. Each of the sons and daughters of the deceased were minors, at the time of his death, except Lucinda P. Smith and Whitman Willcox. On the 27th day of November, 1845, the county judge of Chenango county, acting as surrogate, appointed Benjamin F. Rexford the general guardian of Eli H. Willcox; Elisha B. Smith the general guardian of Gurdon H. Willcox and Mary Ann Willcox; and Whitman Willcox the general guardian of Bradford Willcox and Charles Willcox. In the year 1847, Elisha B. Smith was appointed the special guardian of Mary Ann Willcox and Gurdon H. Willcox, who were still infants, for the purpose of selling certain real estate, descended to them as heirs at law of the deceased; and in the same year Whitman Willcox was appointed the special guardian of Bradford Willcox and Charles Willcox, who were yet infants, for the purpose of selling certain real estate, descended to them as heirs at law of the deceased. They afterwards, as such special guardians, sold such real estate and received the consideration therefor; and they have not, either as special or general guardians, settled with Mary Ann Willcox, now Mary Ann Merritt, Bradford Willcox and Charles Willcox, or either of them.

Willcox *v.* Smith.

Mary Ann Willcox was married to Sherwood S. Merritt on the 13th day of May, 1851. Mrs. Merritt became 21 years of age on the 21st day of March, 1848. Neither Bradford nor Charles Willcox was 21 years of age when the surrogate made the decree appealed from. The citation, for the final settlement of the accounts of the administratrix and administrators as such, was issued, at their instance, by the county judge, acting as surrogate, on the 5th day of January, 1853; and on the 23d day of May, in that year, the administrators and administratrix, as such, severally filed their separate accounts with the surrogate. Mary Ann Merritt and her husband, Bradford Willcox, and Charles Willcox, by guardians *ad litem,* disputed and contested each of the accounts of the administrators and administratrix as rendered; and they severally filed objections to each of them: and thereupon the county judge, acting as surrogate, referred the several accounts to an auditor to examine and report thereon.

Elisha B. Smith claimed, on the final accounting before the surrogate, that the deceased was indebted to him, at the time of his death, in the sum of $735.59, for money which he paid to the Bank of Chenango, on a note of the deceased, on the 8th day of July, 1845. The contestants insisted that this claim was barred by the statute of limitations; but it was allowed to Smith by the surrogate, in his final decree.

On the 26th day of September, 1853, the surrogate, after hearing all parties having an interest in the matter, audited and allowed an account at $1860.70 presented by Whitman Willcox against the deceased, the last item of which accrued April 3, 1845; and the surrogate ordered that Whitman Willcox might retain the sum of $1860.70, and interest thereon from the 26th day of September, 1853, out of the assets of the deceased in his hands. The auditor in his report recognized this claim as a valid one against the estate of the deceased; but the surrogate overlooked it, or at all events did not allow it to Whitman Willcox, in making up his final decree. The statute of limitations was not interposed against

this claim, when it was audited and allowed by the surrogate ; nor on the hearing before the auditor ; and the order of the surrogate allowing Whitman Willcox to retain it, out of assets of the deceased in his hands, had never been appealed from.

In January, 1852, Eli H. Willcox, who was then of full age, conveyed, by deed in due form, all his interest in the real and personal estate of the deceased to Lucinda Willcox, Lucinda P. Smith, Whitman Willcox, Mary Ann Merritt, Gurdon H. Willcox, Bradford Willcox and Charles Willcox. The deed recited a consideration of $5965.21. Elisha B. Smith claimed, before the auditor and surrogate, that he, as administrator, paid $5512.20 of this consideration to Eli H. Wilcox, with money and property belonging to the estate, at different times between May 26, 1846, and the 6th day of December, 1849 ; and that Lucinda Willcox, Mary Ann Merritt and Lucinda P. Smith expressly accepted the conveyance made to them by Eli H. Willcox, and that the general guardians of the minor heirs and next of kin to the deceased also accepted such conveyance. The surrogate allowed and credited to Elisha B. Smith the above mentioned $5512.20, as money and property legally paid out by him as administrator, notwithstanding objections were made thereto by the contestants of the accounts of the administratrix and administrators.

The auditor took such evidence as was offered before him, from time to time, by the parties. Whitman Willcox, one of the administrators, was sworn and examined as a witness before the auditor, for Lucinda P. Smith and for himself, and also for Lucinda Willcox, administratrix, and testified generally in the case, under objections and exceptions taken by the counsel of Mary Ann Merritt, Bradford Willcox and Charles Willcox. Lucinda P. Smith did not file any objections to the accounts of the administrators or administratrix, or to the auditor's report ; and neither she nor her husband, Elisha B. Smith, has appealed from the final decree of the surrogate. Elisha B. Smith, one of the administrators, was sworn and examined before the auditor as a witness for his co-administra-

Willcox *v.* Smith.

tor and the administratrix, and generally in the case, under objections and exceptions taken by counsel for Mary Ann Merritt, Bradford Willcox and Charles Willcox. Benjamin F. Rexford, Esq., who was one of the sureties to the bond of the administrators and administratrix, was examined as a witness before the auditor and surrogate, for the administrators and administratrix, under objections and exceptions taken by counsel for Mary Ann Merritt, Bradford Willcox and Charles Willcox. Lucinda Willcox, the administratrix, was sworn and examined before the auditor as a witness for herself and her co-administrator, Whitman Willcox, under objections and exceptions taken by counsel for Mary Ann Merritt, Bradford Willcox and Charles Willcox. Motions were made, by such counsel, to strike out the evidence of the administrators and administratrix, and their admissions which they made, as to the correctness of some parts of each other's accounts and claims; and also to strike out the evidence of Rexford; but such motions were denied by the auditor, and exceptions were taken by such counsel. The surrogate acted on such evidence, notwithstanding objections were made thereto by counsel for Mary Ann Merritt, Bradford Willcox and Charles Willcox. A voucher, on which the surrogate credited Smith $1000 as administrator, and charged Mary Ann Merritt the same amount as next of kin to the deceased, was in the form following, to wit:

"Elisha B. Smith, guardian of Mary Ann Merritt, formerly Mary Ann Willcox, to Elisha B. Smith, administrator of Whitman Willcox, jr. 　　　　　　　　　　　　Dr.

| | | |
|---|---|---|
| Sept. 15, 1845, one piano | $100 | 00 |
| Jan. 1, 1846, cash | 200 | 00 |
| July 1, 1846, " | 200 | 00 |
| Jan. 1, 1847, " | 200 | 00 |
| July 1, 1847, " | 100 | 00 |
| Jan. 1, 1848, " | 200 | 00 |

$1000 00

Received of Elisha B. Smith, administrator of Whitman Willcox, jr. deceased, the property and money above mentioned, and at the times mentioned, as towards the share of said Mary Ann in the estate of Whitman Willcox, jr. deceased." (Signed,) "Elisha B. Smith, general guardian of Mary Ann Merritt, formerly Mary Ann Willcox."

Some of the vouchers of the administrators were obtained long after the transactions occurred to which they related.

Smith charged to Bradford Willcox, and was credited as administrator by the surrogate, with $1213.42, for money and property he alleged he had paid or advanced to Bradford, while Whitman Willcox was his general guardian. Lucinda Willcox charged to Bradford, and was credited as administratrix, by the surrogate, with $589.78, "for cash, board and other expenses," she alleged she had paid or advanced to Bradford, out of moneys belonging to the estate, while Whitman Willcox was his general guardian. In like manner she charged $589.78 to Charles Willcox, and was credited therefor, as administratrix, by the surrogate, while Whitman Willcox was his general guardian. Lucinda P. Smith became the owner of the interests of Gurdon H. Willcox, in the real and personal estate of the deceased, before the administrators and administratrix rendered their accounts to the surrogate.

The auditor's report bears date the 1st day of December, 1854; but it was not filed with the surrogate until the 22d day of February, 1855. It contained a statement showing that Lucinda Willcox, as widow of the deceased, was entitled to $150 worth of the personal property of the deceased, under chapter 157 of the laws of 1842 ; and other articles of such property, of the value of $192.25, in addition thereto, under the revised statutes. That all of such property and articles were appraised as assets, when the same should have been included and stated in the inventory without being appraised. The auditor was of the opinion, notwithstanding the inventory, that Lucinda Willcox, as widow, was entitled to retain such property and articles, which, in the aggregate, were of

Willcox *v.* Smith.

the value of $342.25. The surrogate took no notice of this part of the auditor's report, and did not in any way credit or allow Mrs. Willcox for such property or articles, either as widow or administratrix.

Henry Snow held a note against the deceased for the payment of $1200 to him on demand, with interest. It was dated the 31st day of August, 1843. Smith, as one of the administrators, paid interest on it at different times, but had not paid the principal. It was presented to the surrogate by Smith, as a demand due from the deceased, and unpaid. It was objected to by the next of kin, on the ground that the claim, upon the note against the estate, was barred by the statute of limitations. The objection was overruled, and the claim was adjudged valid to the amount of $1480.

The administrators and administratrix did not present vouchers for all payments alleged to have been made by them as such, exceeding $20; and the aggregate for which no vouchers were produced, exceeded $500.

Many debts appraised as due the deceased and collectible, had not been collected; and the next of kin contended, before the auditor and surrogate, that no sufficient excuse was shown, or properly shown, for not collecting such debts. And the next of kin also insisted, before the auditor and surrogate, that some of the personal property was not legally accounted for; and that considerable amounts had been lost by the inexcusable negligence of the administrators and administratrix. The auditor's fees were fixed by stipulation.

Mary Ann Merritt, Bradford Willcox and Charles Willcox, *each,* filed 112 exceptions to the auditor's report; Elisha B. Smith filed 31 exceptions to such report; Whitman Willcox filed 6 exceptions, and Lucinda Willcox filed 8 exceptions to such report.

Benjamin F. Rexford acted as counsel for Elisha B. Smith, and *quasi* for his wife, on the accounting before the auditor and surrogate; and he presented an account to the surrogate, against the administrators and administratrix, for $714.71,

for expenses incurred and services rendered by him on such accounting. $10 a day was charged by Rexford for his services, exclusive of disbursements. Henry R. Mygatt acted as counsel for Lucinda and Whitman Willcox on their accounting, before the auditor and surrogate; and for such services and his expenses incurred by him in rendering the same, he presented an account to the surrogate, against the administrators and administratrix, amounting to $601.55. His services were charged at $5 per day, besides expenses.

The surrogate's decree stated, 1st. That the whole amount received by the administrators and administratrix, "from the assets of the estate," including what he charged to them "of interest," amounted to $36,948.84. That he allowed commissions on this sum to the amount of $469.48; of which he gave Smith three-fourths, and the other administrator and administratrix one-eighth each.

The decree further showed, that Smith had received, as administrator of the assets of the deceased, the sum of $21,613.30. That he had paid $11,849.60 of debts due from the deceased. That he had also paid $1266.57 expenses of the administration. That he had paid to Eli H. Willcox, for his interest in the real and personal estate of the deceased, $5512.20. That he had paid to Mary Ann Merritt $1000. That he had paid to Bradford Willcox $1213.42. And that the estate was indebted to Smith in the sum of $4753.59.

The decree also stated that Lucinda Willcox had received, as administratrix, of the assets of the deceased, $4491.16; that she had paid as follows, to wit: For debts of the estate, $198.33; to Eli H. Willcox $616.12, in the same manner that Smith had paid him the $5512.20 above mentioned; to Mary Ann Merritt $337.35; to Gurdon H. Willcox $554.29; to Bradford Willcox $589.78; to Charles Willcox $589.78; and that Lucinda Willcox was indebted to the estate in the sum of $3410.18.

The decree further declared that Whitman Willcox had

received as administrator, of the assets of the deceased, the sum of $4031.33; that he had paid of debts due from the deceased the sum of $3507.52; and that there was due from him to the estate the sum of $2593.20.

The decree further stated that Lucinda Willcox and Whitman Willcox had received, as administratrix and administrator, jointly, of the assets of the deceased, the sum of $2104.61; also that Smith and Whitman Willcox had received as administrators, jointly, of the assets of the deceased, the sum of $1185.12:

The decree further showed that demands to the amount of $1048.32 were due the estate and not collected, for which the administrators and administratrix were equally liable. That there was due from the estate to Henry Snow, on the note hereinbefore mentioned, the sum of $1480.

The decree made Mary Ann Merritt indebted to the estate in the sum of $911.52, and Bradford Willcox indebted to it in the sum of $1091.89. The decree required the persons indebted to the estate to pay Henry Snow his claim of $1480, above mentioned; to Benjamin F. Rexford his claim of $705.60 for services and disbursements; to Henry R. Mygatt his claim of $601.55 for services and disbursements; to Elisha B. Smith his claim of $4753.59, as above stated; which sums, the decree declared, were due to such persons from the estate of the deceased; to Lucinda P. Smith $3.40, and to Charles Willcox $462.67, to complete their distributive shares in the estate of the deceased.

Other provisions were contained in the decree, and some portions of it are not easily understood. Some parts of it are more particularly noticed in the following opinions of the court. The decree differed widely from the auditor's report. The entire case, aside from the voluminous points, contained 2883 folios. It was filled with objections and exceptions; and there were multitudes of alleged errors specified in the petitions of appeal.

Mary Ann Merritt, Bradford Willcox, Charles Willcox, Lu-

cinda Willcox and Whitman Willcox severally appealed from the decree of the surrogate to this court. Smith alleged in his answers to the petitions of appeal, that the surrogate had committed errors in his decision, adverse to his interests, and asked to have them rectified.

The other facts, necessary to a correct understanding of the questions determined in the case, sufficiently appear in the opinion of Justice BALCOM.

*Henry R. Mygatt,* for Whitman Willcox and Lucinda Willcox.

*Rexford & Kingsley,* for Benjamin F. Rexford, Lucinda P. Smith, Elisha B. Smith and Henry Snow.

*Henry Van Der Lyn,* for Henry R. Mygatt.

*Henry C. Goodwin, Sherwood S. Merritt* and *John Wait,* for Mary Ann Merritt, Bradford Willcox and Charles Willcox.

BALCOM, J. The decree of the surrogate states that there is due from the estate of Whitman Willcox, jun. deceased, to Henry Snow, on a note executed by the deceased to him, the sum of $1480; that there is due to Benjamin F. Rexford from such estate the sum of $705.60; and that there is due from such estate to Henry R. Mygatt, for services rendered in settling the same, the sum of $601.55; which several sums the decree declares shall be paid from the estate of the deceased. These sums are decreed in favor of Snow, Rexford and Mygatt, against such estate, although the decree requires Lucinda Willcox, Mary Ann Merritt, Whitman Willcox and Bradford Willcox to pay such sums to Snow, Rexford and Mygatt; for it declares that the former owe the estate sufficient moneys to satisfy such sums. Rexford and Mygatt were not parties to the proceedings before the surrogate, and could not have been legally made such; but the surrogate having, by

Willcox *v.* Smith.

the decree, awarded them the sums above mentioned, they, as well as Snow, are interested in sustaining the decree; and therefore they were properly made parties respondents in the petitions of appeal to this court. (1 *Barb. Ch. Pr.* 428. *Gilchrist* v. *Rea*, 9 *Paige*, 66. *Kellett* v. *Rathbun*, 4 *id.* 102. *Gardner* v. *Gardner*, 5 *id.* 170.)

Rexford's claim, adjudged to him by the decree, as well as Mygatt's, was for disbursements paid and services rendered for the administrators and administratrix on their final accounting and settlement before the surrogate; therefore neither Rexford nor Mygatt was a creditor of the deceased; and neither of them had any claim against his estate. The administrators and administratrix employed them as counsel, to assist in arranging, substantiating and settling their accounts before the surrogate: and they were personally liable to pay Rexford and Mygatt for their disbursements and services in those proceedings. And it was not in the power of the administrators and administratrix to make an agreement with Rexford and Mygatt, on which they could have any claim against the estate of the deceased. No persons could have claims against the estate of the deceased, arising on contract, except those who made contracts with him, and such as succeeded to their rights.

The creditors, to whom the surrogate is authorized to decree the payment of debts by executors and administrators, on a final settlement of their accounts, are those whose claims arise on contracts made with the deceased; and not such as have demands against the executors or administrators personally, by reason of agreements which they have made with the executors or administrators, even while in the proper discharge of their duties in administering upon the estates under their control. (*See* 2 *R. S.* 95, § 71.)

Rexford and Mygatt, not being parties to the proceedings before the surrogate, could not have costs awarded to them, because the statute only authorizes the surrogate to award costs to *parties*. (2 *R. S.* 223, § 10.) And costs, when adjudged to a party by the surrogate, are such, only, as were

formerly allowed for similar services in the late courts of common pleas. (*Laws of* 1837, *ch.* 460, § 70. *Sherman* v. *Youngs,* 6 *How. Pr. R.* 318. *Burtis* v. *Dodge,* 1 *Barb. Ch.* 77. *Halsey* v. *Van Amringe,* 6 *Paige,* 12. 3 *id.* 182. *Western* v. *Romaine,* 1 *Bradf.* 37.) They must still be taxed at the rates of common pleas costs, as they were allowed prior to the code. (*See authorities above cited.*) This is certainly the rule; for the reason that the second part of the code, which includes that portion thereof that allows and regulates costs in civil actions, is inapplicable to proceedings in surrogates' courts, and does not affect appeals from such courts. (*Code,* § 471. 6 *How. Pr. Rep.* 318.)

It seems to be well settled that an executor or administrator is not entitled to charge the estate he represents with a counsel fee paid by him upon the final settlement of his accounts before the surrogate; or for drawing up his accounts in a proper and legal form on such a settlement; and also that the surrogate has no authority to make an arbitrary allowance to him in lieu of the compensation directed by the statute to be paid to advocates and proctors in surrogates' courts, where the same is to be paid as costs in the suit or proceeding, either by the adverse party, or out of the fund in litigation. (*Burtis* v. *Dodge,* 1 *Barb. Ch.* 77. *Halsey* v. *Van Amringe,* 6 *Paige,* 12. 1 *Bradf.* 37.) This rule does not conflict with the one, now statutory, which authorizes the surrogate to allow executors and administrators "for their actual and necessary expenses," which are "just and reasonable," in the management of the estates committed to them; (*see* 2 *R. S.* 93, § 58; *Laws of* 1849, *ch.* 160;) such as expenses incurred by them, in employing agents and clerks, where their services are beneficial to such estates; (*McWhorter* v. *Benson, Hopkins' Ch.* 28; *Vanderheyden* v. *Vanderheyden,* 2 *Paige,* 287; 9 *id.* 440; 2 *Denio,* 575; 2 *Bradford,* 291, 294;) and such as costs paid in actions brought by them, in good faith, to recover debts supposed to be due to their decedents, when the results show that different modes of proceeding would have been more

beneficial to the parties interested in the estates. (*Collins* v. *Hoxie*, 9 *Paige*, 81.)

The two rules already mentioned harmonize; and they are founded on solid reasons. It is not often that executors or administrators need the services of counsel in making final settlements of their accounts before the surrogate, if they have properly managed the estates in their hands, and are diligent in making such settlements; and where they are negligent, or permit their accounts to become confused, or suffer the estates under their control to decrease unnecessarily, they ought to pay counsel out of their own funds, for assisting them in closing up their trusts. And the reasons are too obvious to be stated, which uphold the rule that permits the surrogate to allow them all actual and necessary expenses incurred by them, which appear reasonable and just, in bringing and defending actions, in good faith, with the expectation of benefiting the estates under their control; and in managing such estates, solely for the benefit of those interested in them.

The preceding conclusions render it apparent that the surrogate had no authority to award costs to either Rexford or Mygatt, for disbursements paid and services rendered by them for the administrators and administratrix, on their final accounting and settlement before him; and also, if he had adjudged costs for their disbursements and services, to the administrators and administratrix, the decree could not be sustained; because he taxed Rexford and Mygatt's charges for services by the day, and included in their bills, as disbursements, moneys paid by them for the use of horses and wagons, for horse feed and for their own board. (*See Kirtland's Surrogate*, 103.)

But I will not stop here on the question of costs; for I am of the opinion the surrogate could not, upon the facts in the case, award even taxable costs to the administrators and administratrix, to be paid out of the estate of the deceased, or personally by the contestants of their accounts.

The administrators and administratrix took their letters of

administration from the surrogate on the 1st day of September, 1845, when the contestants were all infants. The statute made it their duty to return an inventory of the personal estate of the deceased " to the surrogate within three months of the date of such letters ;" (2 *R. S.* 84, § 15;) but they had not even made oath to its accuracy in 1852, when the contestants, as next of kin to the deceased, commenced proceedings before the surrogate to compel them to return it; and they did not file it with the surrogate until the 5th day of January, 1853 ; and they had no reasonable excuse or apology for this long delay. Their oaths, which they attached to the inventory, are contradictory, and vary from the requirements of the statute. (2 *R. S.* 84, § 16.) Two of them swore that Smith had been *the acting administrator of the estate,* and that they made their oath, as to the correctness of the inventory, from the best of their knowledge, information and belief, *and under the advice of counsel that the same was not conclusive upon them.* Smith, the other administrator, swore that he had but little knowledge of the property of the deceased, previous to his appointment as administrator; that all the notes, books, accounts, mortgages and contracts, and evidences of debts, appraised, were in the possession of his co-administrator and administratrix, or one of them, and were presented to the appraisers by them: and that most of the personal property of the deceased, in the county of Chenango, was at the time in the possession of one or both of them. That they had ever since their appointment been acting administrator and administratrix; and that he, Smith, had not been, at any time, sole acting administrator of the estate of the deceased, *according to his best knowledge and belief;* but that he *supposed,* at all times, the *three* were acting *co-jointly,* although particular acts might have been done by one alone; also that he made his affidavit *under the advice of counsel, and claimed that he was not concluded by the same!*

Why did the administrators and administratrix swear in this way? Would they have so shaped their oaths if they

had been guilty of no negligence or misconduct in the management of the estate committed to their charge? It seems to me they would not; and that their oaths to the inventory had a tendency to incite the heirs and next of kin to the deceased into a scrutiny of their accounts and doings with the estate. I think the case shows that they had been remiss in collecting debts due to the deceased; in paying those contracted by him; in converting the personal property into money, and in taking vouchers for moneys paid out by them; also, that they had applied some of the personal estate to uses not authorized by law, and had unnecessarily permitted the same to decrease in their hands; they therefore framed their oaths, as above set forth, preparatory to mystifying the case; and with the hope of escaping individual liability for the injuries they had done, or permitted to be done, to the estate; and I have no doubt but that the long delays and great expenses on their final accounting, were caused by the improper manner in which they had executed the trusts reposed in them; and by the difficulties they encountered in shaping their accounts, and getting up vouchers, to make all their transactions, connected with the estate, appear fair on their face. It was not, therefore, a case in which the surrogate should have allowed the administrators and administratrix any costs whatever, out of the estate, beyond the fees of the auditor and his own fees, incurred by them in making their final accounting and settlement. (*See* 10 *Paige*, 191; 4 *id.* 102; 3 *id.* 88; 10 *Barb.* 432.) And I am of the opinion the contestants were entitled to costs, to be paid out of the estate of the deceased; and that the surrogate should have awarded costs to them. (2 *R. S.* 223, § 10.) It has been correctly held that the decision of the surrogate awarding costs, in a case like this, may be reviewed on appeal. (*Lain* v. *Lain,* 10 *Paige,* 191.)

Was Henry Snow's claim, on the note he held against the deceased, barred by the statute of limitations, so that the surrogate could not decree its payment out of the estate of the

deceased? The date of the note was August 31, 1843; it was signed by the deceased, and bound him to pay Henry Snow $1200 on demand, with interest. It was unpaid when the letters of administration were issued on the estate of the deceased. On the 31st day of August, 1847, one of the administrators paid the interest then due on the note to Snow; and such administrator continued to pay interest on it until the 31st day of August, 1852. The inference is irresistible, that Snow presented the note to the administrators and administratrix within seven years and a half next after its date; and that they allowed it as a valid claim against the estate of the deceased. (6 *Hill,* 389.) The administrators and administratrix not doubting the justice of the claim, and having allowed it, there was nothing in dispute between them and Snow to refer to referees, under the statute. (1 *Denio,* 276.) And for the same reason there was no necessity, or even propriety, for a suit by Snow to establish his claim. He was not bound to exhibit evidences of his claim, or make oath of the justice thereof, because nothing of the kind was required of him. (6 *Hill,* 389. 2 *R. S.* 88, 89, §§ 35 *to* 39.)

Snow's claim having been duly recognized and allowed by the administrators and administratrix, as a valid one against the estate represented by them, within seven years and a half from the time it became due; (*see* 1 *Hill,* 36; 2 *R. S.* 448, § 8; 1 *Denio,* 151;) and their final accounting and settlement having been made within six years of the time that they so recognized and allowed it, the next of kin to the deceased could not require its rejection by the surrogate, upon the final settlement of the estate, on the plea of the statute of limitations. They could not set up such statute against the claim, under such circumstances; and the administrators and administratrix would have been defeated, if they had interposed such statute against the claim.

Snow's claim was not disputed by the administrators and administratrix, before the surrogate; and it was not a disputed claim, within the meaning of the adjudications on the

Willcox *v.* Smith.

question. (*See* 13 *Wend.* 35; 6 *Barb.* 352; 10 *id.* 308; 2 *Selden*, 216; 2 *Barb. Ch. R.* 414.) The surrogate could therefore allow it, as a debt against the estate of the deceased, to be paid from assets in the hands of the administrators and administratrix. (2 *Barb. Ch. R.* 414.) But the decree, in regard to this debt, was erroneous, so far as it required Mary Ann Merritt, Bradford Willcox and Charles Willcox, or either of them, to pay any portion of it. (2 *R. S.* 93, § 58. *Id.* 94, § 65. *Id.* 95, § 71. *Laws of* 1849, *p.* 218. 2 *Seld.* 216. 1 *Kernan*, 324. 10 *Barb.* 523. 1 *Hill*, 130. 3 *Barb. S. C. R.* 341. 10 *id.* 309.)

On the subject of the statute of limitations, I will add, that when an executor or administrator presents a claim in his own favor, against the estate he represents, to the surrogate for allowance, legatees or next of kin may set up the statute of limitations against it; (*see* 2 *Bradf.* 116; 1 *Barb. Ch. R.* 455;) and they, as well as heirs and devisees, may interpose such statute as a defense, when sued by creditors of a deceased person, for any portion of his personal or real estate received by them. Where, however, a claim against a deceased person is presented to his executor or administrator, or to the surrogate, for payment out of the personal estate of the deceased, *yet in the hands of the executor or administrator*, nobody but such executor or administrator can dispute such claim, or set up the statute of limitations against it. (2 *R. S.* 88, §§ 35, 36.) But an executor or administrator is personally liable if he allows a claim, against the estate of the decedent, which he knows to be unfounded or unjust; and it is asserted by Dayton that he renders himself personally liable if he omits to set up the statute of limitations, in a case where that defense may be successfully interposed. (*Dayton's Surrogate,* 2d ed. 318.) But I will express no opinion as to the correctness of Dayton's view of the question; for none is necessary in this case. (*See, however,* 2 *Kent's Com.* 4th ed. *p.* 418, *note a;* 2 *Com. Dig.* 483; 1 *Atkyns*, 524; *Kirtland's Surrogate,* 186, *and note x, foot of page*

317 *in Dayton's Surrogate,* 2d *ed.;* 5 *Pick.* 144; 13 *Mass. R.* 201; 16 *id.* 172, 429.)

No sufficient excuse was shown before the auditor or surrogate, why the note Snow held against the deceased was not fully paid by the administrator and administratrix, within eighteen months from the time of their appointment. They had abundant means in their hands for paying it; and they should have been charged personally, by the surrogate, with all interest that accrued on it after the expiration of the eighteen months above mentioned; or with interest from that date on the sum then due on the note. (*Dayton's Surrogate,* 2d *ed.* 480.)

An executor or administrator who is the general guardian of an infant, cannot, of his own motion, transfer any portion of the personal estate of the deceased, in which his ward has an interest as next of kin or legatee, from himself as executor or administrator, to himself as general guardian of the infant, so as to relieve him from accounting for all of such personal estate, as executor or administrator, before the surrogate. He must keep that portion of the estate, as executor or administrator, which belongs to his ward, until he has authority from the surrogate to hold it as a general guardian.

Whenever an executor or administrator's account is finally settled before the surrogate, and any part of the personal estate remains to be distributed, the surrogate shall make a decree for the payment and distribution of what shall so remain, to and among the creditors, legatees, widow and next of kin to the deceased, according to their respective rights. (2 *R. S.* 95, § 71.) And where a distributive share is to be paid to a minor, it cannot be paid to his general guardian for any purpose, without the direction of the surrogate. (2 *R. S.* 98, §§ 80, 82.) Neither can a legacy be paid to the general guardian of a minor, unless by permission of the surrogate. (2 *R. S.* 91, § 47. *Id.* 98, § 82.)

The foregoing conclusions render it clear that Smith's pretended voucher was a nullity, by which he attempted to

relieve himself from accounting for $1000 of the assets of the deceased, *as administrator*, before the surrogate, by crediting himself with that sum, as administrator, and charging himself with the same, *as general guardian* of Mary Ann Merritt, formerly Mary Ann Willcox.

Smith's claim against the estate of the deceased, for an alleged payment of $735.59 to the Bank of Chenango, on the 8th day of July, 1845, and interest thereon, was barred by the statute of limitations; and the surrogate should have disallowed it. The decedent did not die until the 4th day of August, 1845; and over seven years and a half elapsed before this claim was presented by Smith to the surrogate for allowance. It has already been shown that the next of kin to the deceased could set up the statute of limitations against the allowance of such a claim by the surrogate, when presented by an administrator. (*See authorities hereinbefore cited.*) And Smith could not retain assets, in payment of this claim, until it was allowed by the surrogate. (1 *Bradford*, 116. *Laws of* 1837, *ch.* 460, § 37. *See* 18 *Wend.* 319.)

Smith should have been charged, by the surrogate, with his note of $400, dated July 15, 1841, and interest thereon. It was owned by the deceased at the time he died, and it was inventoried as part of his personal estate. The fact that Smith's claim of $735.59, for an alleged payment by him to the Bank of Chenango, was barred by the statute of limitations, does away with the reason assigned by the auditor for not charging him with his note; and no good cause was shown for not charging him with his note and the interest thereon.

The administrators and administratrix had no authority or control over the real estate left by the deceased, except to mortgage, lease or sell it for the payment of his debts, when specially authorized to do so by the surrogate. They were not warranted in paying any taxes on it, which were assessed subsequent to the death of the deceased, or in making payments upon mortgages, on real estate conveyed by him, or

whereof he died seised, which he was under no personal obli-
gation to pay. (*Dayton's Surrogate*, 2d ed. 236, 551.) The
reason why they could not pay such taxes or mortgages on
real estate, with the assets of the deceased, is that the assets
were applicable only to the payment of his debts, and such
taxes and mortgages were not, in any sense, his debts. They
were charges on the real estate, which were for the heirs to
pay, to whom such real estate descended.

Whitman Willcox and Elisha B. Smith were appointed the
general guardians of four of the infant heirs and next of kin
to the deceased, on the 27th day of November, 1845; and
they received the rents and profits of their wards' real estate,
and also the proceeds of some of their real estate which they
sold as special guardians. But they had no right to use
moneys, as administrators, which they received as guardians;
and the surrogate should not have allowed them for any pay-
ments or advances made to the widow or next of kin, out of
such moneys. Whatever amounts of such moneys they paid
to or for the widow or the next of kin, should have been laid
out of view by the surrogate, on their accounting as admin-
istrators.

Lucinda Willcox, as widow of the deceased, should have
been allowed by the surrogate to retain the personal property
of the deceased, specified in the auditor's report, amounting in
value to the sum of $342.25. She was entitled to $150 worth
of the same under section 2 of chapter 157 of the laws of
1842; (*see* 6 *Hill*, 642; 4 *Selden*, 31; 2 *id.* 597;) and the
residue thereof should have been allowed to her, pursuant to
the revised statutes. (2 *R. S.* 83, § 9.)

On the 26th day of September, 1853, the surrogate, after
hearing all persons interested in the matter, audited and
allowed a claim presented by Whitman Willcox against the
estate of the deceased, at $1860.79, and authorized him, as
administrator, to retain that sum, with interest thereon, out
of the assets of the deceased in his hands. It does not appear
by the case, upon what evidence this claim was allowed, or

Willcox *v.* Smith.

that it was contested on any particular ground; nor does the case show that the statute of limitations was set up against it, either before the surrogate or auditor, although the entire claim accrued upwards of seven years and a half before it was presented to the surrogate for allowance; and no appeal has been taken from the order of the surrogate allowing it. This claim was not credited to Whitman Willcox by the surrogate in the final decree appealed from; and I think it was over-looked by him, through inadvertence; for I am unable to perceive any reason why Whitman Willcox should not have been permitted, by the final decree, to retain this claim, as previously audited and allowed by the surrogate, out of the assets of the deceased in his hands. He must be allowed to retain it, on the rehearing of the case.

Smith had no right, *as administrator*, to purchase the interest which Eli H. Willcox had as next of kin in the personal estate of the deceased, or the interest he had as heir in the real estate left by the deceased, for his co-administrator and the administratrix, or for the heirs and next of kin; and his co-administrator and the administratrix, by the express consent of all the heirs and next of kin and their guardians, had not power to authorize him to purchase, *as administrator*, the interests of Eli H. Willcox in either the real or personal estate of the deceased: neither had the surrogate power to authorize him to do it. Such purchase was not an act which he could do in his representative character.

Smith could have purchased such interests of Eli H. Willcox, for himself individually, or as agent of the widow and such of the heirs and next of kin as were of full age, if he had had authority from them to do so, and had used his or their funds in paying for such interests. I will not say whether he could have purchased such interests of Eli H. Willcox, *as the general guardian* of some of the infants, and had the same sanctioned by the court; for I do not think it necessary to pass upon that question in this case. That question can properly arise only when Mr. Smith shall account as guardian

of Mary Ann Merritt. (*See on this point,* 11 *Barb.* 22 ; 4 *John. Ch.* 100; 8 *Paige,* 89 ; 2 *Kent's Com.* 230.)

Whatever assets, belonging to the adult next of kin, were used by Smith with their consent, in purchasing the interests of Eli H. Willcox in the real and personal estate of the de‑ ceased, the surrogate could rightfully charge to such adults, to the amount only of their distributive shares in the personal estate of the deceased, over and above the just claims of cred‑ itors. · Such disposition of assets, belonging to the adults, by Smith, should be regarded as advancements by him to them towards their distributive shares in the personal estate of the deceased. But the surrogate had no right to credit him, on his accounting, for such payments or advancements to the adult next of kin, beyond the amounts of their respective distributive shares in the personal estate of the deceased, for two reasons ; 1st. The next of kin, who were infants or who did not consent to such disposition of the assets of the deceased, could not be prejudiced thereby, or have their shares lessened in that man‑ ner : 2d. The surrogate's jurisdiction is limited ; and he had no authority to decree that either of the next of kin to the de‑ ceased should pay back any excess of assets received from Smith, over and above his or her distributive share. (*See* 2 *R. S.* 93, § 58; *Laws of* 1849, *ch.* 160; 2 *R. S.* 94, § 65; *id.* 95, § 71; 2 *Selden,* 216; 1 *Hill,* 130; 3 *Barb.* 341; 10 *id.* 309, 523.) Smith's remedy, if he has any, to recover back any such excess of assets advanced by him to or for the next of kin to the deceased, must be sought in another forum.

If Smith paid for the interests of Eli H. Willcox, in the estate of the deceased, with money or property other than assets of the deceased, that is to say, such as the proceeds of real estate sold or the rents and profits of real estate, he was not entitled to any credit as administrator, or to have any thing deducted from the distributive share of either of the next of kin, or widow, on his final accounting and settlement before the surrogate. His claims for money or property so expended for them, could be enforced only by actions insti‑

tuted in this court. The surrogate could not compel the widow or next of kin to the deceased, to pay him for such money or property. It was no part of his duty to adjust equities, between the administrators and next of kin, outside of the management and disposition of the personal estate of the deceased.

What I have said on the subject of the purchase by Smith, of the interests of Eli H. Willcox in the real and personal estate of the deceased, leads me to the conclusion that the surrogate erred in crediting Smith as administrator with $5512.20, as and for money paid by Smith to Eli H. Willcox for his interests in the real and personal estate of the deceased. And I will add that there is no evidence in the case to show that Lucinda Willcox, Mary Ann Merritt and Mrs. Smith were informed, when they said they accepted the conveyance from Eli H. Willcox of his interests in the estate of the deceased, that Smith had paid or was about to pay for such interests with assets of the deceased, in his hands as administrator.

Bradford Willcox was a minor and Whitman Willcox was his general guardian, yet the surrogate has adjudged that he is liable for $1213.42 of assets or moneys received by him from Elisha B. Smith! and also that he has received of the personal property of the estate, by his general guardian, the sum of $1091.89 more than his distributive share; and that he must refund and pay this latter sum, by his general guardian, to Henry Snow, Benjamin F. Rexford, Henry R. Mygatt, Elisha B. Smith, Lucinda P. Smith and Charles Willcox or some of them, as creditors! And the decree makes this sum a charge on the estate of Bradford Willcox. This part of the decree is clearly erroneous, according to the views hereinbefore expressed; and I will add that it seems to me the case does not show sufficient facts to charge Bradford Willcox with any portion of the sum of $1213.42. (*See* 2 *Paige,* 419; 1 *id.* 102; 2 *Kent,* 230; 11 *Barb.* 22; 8 *id.* 48.)

The statute is imperative that every executor or administrator, in rendering his accounts to the surrogate on a final

settlement, " *shall* produce vouchers for all debts and legacies, paid, and for all funeral charges and just and necessary expenses." (1 *R. S.* 92, § 54. *Dayton's Surrogate,* 472, 2*d ed.*) Dayton says, the surrogate may, *in a proper case,* sustain the account of an executor or administrator, on his final settlement, " even without vouchers." (*Id.* 472.) He does not say what kind of a case is a proper one in which the account may be sustained without vouchers; and I think if such an account can be allowed, in any case, without vouchers and without proof other than the death of the executor or administrator, where separate items of it exceed $20 in amount, it is where creditors refuse to give vouchers; or where the executor or administrator has lost his vouchers, or where they have been stolen or destroyed, and he is unable to procure others. A special act was once passed by the legislature, authorizing the surrogate to allow the accounts of certain administrators without vouchers where they had been destroyed by fire. (*See Laws of* 1847, *ch.* 71.) Perhaps the surrogate should consider such cases as I have mentioned implied exceptions to the statutory rule, on the assumption that the legislature could not have intended to require executors and administrators to perform impossibilities or sustain losses.

The only expenditure which the statute authorizes the surrogate to allow to executors and administrators, for which no voucher is produced, without proof of such expenditures other than their own oaths to their accounts, are items not exceeding twenty dollars each; and they must support such items by a positive oath to the fact of their payment, specifying when and to whom such payment was made; and then such oath must be uncontradicted; and such allowances shall not, in the whole, exceed five hundred dollars, for payments, in behalf of any one estate. (2 *R. S.* 92, § 55. 4 *Paige,* 102. 6 *id.* 166.) Also see case in 2 *Selden,* 216, as to the necessity of the executor or administrator producing negotiable promissory notes to the surrogate.

The fact that a voucher has been procured by the executor

or administrator, a long time subsequent to the transaction to which it relates, is a suspicious circumstance against its accuracy, but that does not justify the surrogate in refusing to receive it as evidence when offered before him. (*Dayton's Surr.* 2*d ed.* 474. *See Tomlin's Law Dict. tit. Voucher, for the meaning of the word.*)

The accounts rendered by executors and administrators should be duly verified by them when presented to the surrogate, especially where the rights of infants are to be affected, although their verification is not required by the parties who appear. (6 *Paige,* 166. 1 *Barb. Ch. R.* 469. *Dayton's Surrogate,* 2*d ed.* 472.)

The above mentioned rules show to what precision executors and administrators are held in rendering, verifying and establishing their accounts on their final settlement before the surrogate; and they are eminently just, and should not be departed from, except in cases of the most urgent necessity, and in order to prevent absolute injustice. The administrators and administratrix should be required to comply with these rules on the rehearing of this case.

Were the administrators and administratrix competent .witnesses for each other, on their accounting, before the auditor and the surrogate? It was settled, prior to the year 1857, that the code was not applicable to proceedings by executors and administrators on the settlement of their accounts in surrogates' courts. (*See Woodruff* v. *Cox,* 2 *Bradf.* 223; 16 *Barb.* 200; 3 *Kernan,* 93; 6 *How. Pr. Rep.* 318; *also see remarks and authorities in a former part of this opinion.*) And none of the amendments to the code passed by the legislature of 1857, have changed this rule. The admissibility of the administrators and administratrix as witnesses for each other, must therefore be determined by the law as it exists irrespective of the code. They were at least jointly liable to account for a considerable portion of the assets of the deceased; (*see* 11 *Paige,* 265; *Dayton's Surrogate,* 2*d ed.* 484, 485;) and *prima facie* they were jointly liable for the

entire amount of his personal property, as shown by the inventory of it. They were called to testify, and did testify, directly in favor of their own interests; they were therefore incompetent to be witnesses for each other. (*See* 1 *Barb. Ch. R.* 585; 2 *Paige*, 54; 6 *id.* 585; 1 *Greenl. Ev.* § 361; 2 *R. S.* 92, 93, 94, 95 *and* 98, §§ 54 *to* 59, 65, 71, 80, 82.) The device of having them sworn, nominally for Mrs. Smith, who did not contest their accounts at all, did not authorize their examination, substantially in their own behalf and for each other. They could not testify for each other, for the further reason that they were parties on the record, to the proceedings in which they were examined. (1 *Phil. Ev.* 69. 3 *Comst.* 490, 491.)

It is true, the legislature has declared that executors and administrators "may be examined on oath," touching any payments made by them in their representative characters, and also touching any property or effects of the deceased which have come to their hands, and the disposition thereof. (2 *R. S.* 92, § 54.) This statute was passed when the law was that a party to a suit or proceeding could not even call his adversary as a witness, except in certain cases, by special permission, in the court of chancery; and I think it was intended only to give parties, who contest the accounts of executors and administrators, the right to examine them as witnesses. (*See* 1 *Bradf.* 356.) If more had been intended, it seems to me the legislature would have said that they might be examined on oath, as witnesses in their own behalf. This is the kind of language subsequently employed by the legislature in authorizing parties to suits, provided for by the code, to be witnesses for themselves. (*Code*, § 399.) Besides, executors and administrators were permitted to verify their accounts by affidavit, at the time the statute above mentioned was enacted; and we can hardly presume that the legislature would have interfered in order to authorize them to testify, orally, as witnesses, to sustain their accounts, when swearing to them on paper was allowed. I am therefore of the opinion

that the statute referred to does not secure the right to execu-tors and administrators to be examined as witnesses for them-selves, on their final accounting before the surrogate.

But Smith's counsel contended that because Lucinda Will-cox as widow, and Whitman Willcox as next of kin, were entitled to certain portions of the assets of the deceased after the payment of his debts, they could be witnesses for each other, and that either could call Smith as a witness. And he also stated that they were competent for each other be-cause, as he alleged, they were not liable for each other's *devastavit*. The first answer which I shall make to this position is, that Lucinda Willcox and Whitman Willcox were before the auditor, as well as the surrogate, as administratrix and administrator, and they there litigated in those charac-ters; the second is, that their interests as administratrix and administrator, in the matters in dispute, greatly exceeded those they had as widow and next of kin. (24 *Wend.* 116. 7 *Hill,* 58. 1 *Greenl. Ev.* § 391.) Another is, that *prima facie,* they were jointly liable for the entire personal estate, as stated in their inventory of it, and clearly so for the greater portion of it until they had testified. The conclusion to which I have come, therefore, is that the administrators and administratrix were not competent witnesses for them-selves or for each other, on their final accounting, either be-fore the auditor or the surrogate.

Was Benjamin F. Rexford a competent witness for the ad-ministrators and administratrix, or either of them, on their accounting? Their bond as administrator and administra-trix was joint, and Rexford signed it as one of their sureties. He gave evidence for them which tended to relieve them from personal liability for a portion of the property of the deceased mentioned in the inventory; and the bond which he executed was conditioned that such administrators and administratrix should faithfully execute the trust reposed in them, as such; and also, that they should obey all orders of the surrogate, touching the administration of the estate committed to them,

(2 *R. S.* 77, § 42.) The decree of the surrogate, making the administrators and administratrix personally liable for a portion of the assets of the deceased, would be evidence against Rexford in an action against him on his bond. (*See Douglass* v. *Howland,* 24 *Wend.* 55; *Rapelye* v. *Prince,* 4 *Hill,* 119; *Cowen & Hill's Notes, p.* 984; 1 *Greenl. Ev.* §§ 390, 392, 393, 395, 397.) He therefore had a direct interest in the result of the proceedings before the surrogate, in favor of the administrators and administratrix; and for this reason was an incompetent witness for them or either of them. (1 *Greenl. Ev.* § 386. 2 *Cowen's Tr.* 2d ed. 964. 1 *Phil. Ev.* 54. *Woods* v. *Skinner,* 6 *Paige,* 76.)

Executors and administrators, in making up their accounts, are, first, to charge themselves with the amount of the property of the deceased contained in the inventory, at the appraised value. (*Kirtland's Surrogate,* 197 *and* 392.) They are then to make themselves debtor for the increase to the same; such as interest that has accrued on debts owing to the deceased, and property and demands which have been discovered subsequent to the taking of the inventory; next, sums for which they have sold property, exceeding its appraised value; and then all other increase to the inventory, and the items thereof. The whole increase being added to the value of the property, as shown by the inventory, constitutes the debtor side of their accounts. The credit side of their accounts consists, first, of debts marked bad or doubtful, which have not been paid, to them, at the amounts thereof set down in the inventory; secondly, of sums for which they have necessarily sold property at less prices than its appraised value, with a list of the articles so sold; thirdly, the articles of property lost without their fault, and the cause of such loss, with the appraised value of such articles; fourthly, the particular debts, appraised as good, which they have been unable to collect by the exercise of ordinary diligence, and the reasons why they could not collect them, with the amounts of such debts, as noted in the inventory; fifthly,

the debts paid by them, to whom paid and when, and the amounts thereof; sixthly, the items of their actual and necessary expenses paid in the execution of the trusts reposed in them. The sum total of such credits is then to be subtracted from the amount of the debtor side of their accounts. Following the remainder the articles of property yet unsold are to be mentioned, with the appraised value thereof, and also the reasons why they have not sold the same. And afterwards they are to set forth all other facts which are pertinent and proper to be considered by the surrogate in making up his decree. It is not absolutely necessary that the accounts of executors and administrators should in all cases be made out in the manner above stated, but such method ought to be substantially adopted.

In this case the amount at which the inventory footed, or that it was footed at all, is not mentioned by either administrator or the administratrix, by the auditor or the surrogate. In one of the petitions of appeal the amount is stated to be $42,189.68; but I have not added the figures together to see if that is the true sum.

Many errors were committed by the auditor and surrogate, which I have not mentioned; and I do not deem it necessary to notice them, for the reason that the entire decree must be reversed, and the whole case must be reheard before the surrogate, without regard to the auditor's report, or any decision made by the surrogate on the hearing heretofore had before him. (See 1 Barb. Ch. Pr. 404, 431; 1 Bradf. 133; 2 id. 1.) And according to the views hereinbefore expressed, the costs of Mary Ann Merritt, Bradford Willcox and Charles Willcox in the surrogate's court, as well as their costs on the appeals to this court, and also the fees of the auditor and surrogate, should be charged upon and be paid out of the estate of the deceased in the hands of the administrators and administratrix; and the costs of the administrators and administratrix in the surrogate's court, (except the fees of the auditor and surrogate,) as well as their costs on the appeals to this court,

---

---

should be borne by them personally. (2 *R. S.* 618, § 25.) And Rexford, Mygatt and Snow should pay their own costs on the appeals.

GRAY, J., concurred in the reversal, upon the ground that the administrators and administratrix and Rexford were erroneously allowed to testify; and upon the ground that Smith's receipt as guardian, to himself as administrator, was improperly received in evidence. He did not express an opinion upon any other point.

MASON, J. The auditor committed an error in allowing these administrators to be sworn in behalf of each other. They were not competent witnesses for each other under the common law rules of evidence, or the statutes relative to proceedings before surrogates. And our code of procedure in civil actions has no application to proceedings in surrogates' courts; (*Woodruff* v. *Cox,* 2 *Bradford,* 223; *Sherman* v. *Youngs,* 6 *How. Pr. R.* 318; *Burritt* v. *Silliman,* 16 *Barb.* 198, 201;) and the surrogate erred in basing his decree upon this evidence.

They are not competent witnesses on this final accounting before the surrogate, at common law. (*Pack* v. *The Mayor &c. of New York,* 3 *Comst.* 489. 1 *Phil. Ev.* 69.) Being a party to the record was enough to exclude them, at common law, either in behalf of themselves or their co-administrators, although they had no interest in the suit. (4 *Comst.* 489.) In actions at law administrators are incompetent witnesses for each other. (1 *Greenl. Ev.* 371. *Fort* v. *Gooding,* 9 *Barb.* 371. *Woods* v. *Skinner,* 6 *Paige,* 76. *Rogers* v. *Dibble,* 3 *id.* 238. *Dean* v. *Thornton,* 3 *Kernan,* 266.) They were incompetent witnesses, in equity. They all gave a joint bond with sureties. They all united in returning an inventory, and all have power over the personal estate. They are all parties to these proceedings before the surrogate on the final accounting, and are all attempting to promote their own interests by accounting for the property so as to avoid liability. They are

Willcox *v.* Smith.

all equally, *prima facie*, liable to creditors and the next of kin for the property mentioned in the inventory. (2 *Kent's Com.* 507, 8, *4th ed.; 3d ed.* 414, 15. 1 *Bradf. Surr.* 321, 333. 2 *id.* 220, 221. *Wright's Ex'r's Guide*, 92, 104, 114. 2 *R. S.* 146–149, *3d ed.*) And if we strike out the evidence of these administrators themselves there is nothing in the case showing any thing but the ordinary case of joint liability on these administrators, for all the assets embraced in the inventory; and the rule is well settled that when an objection is made to the competency of a witness, upon testimony already given, and he is sworn and examined under the objection, the court cannot take his evidence into account in determining the question of his competency. (*Mott* v. *Hicks*, 1 *Cowen*, 513.) They are not competent witnesses in equity. (*Clark* v. *Clark*, 8 *Paige*, 153, 159. *Johnson* v. *Corbett*, 11 *id.* 277. *Eckford* v. *DeKay*, 6 *id.* 565. 2 *id.* 54, 60. 1 *Barb. Ch. R.* 585. 1 *Greenl. Ev.* § 361. 3 *id.* § 314. 2 *Cowen & Hill's Notes*, 1550.)

The statute in regard to proceedings before surrogates on the final accounting makes no provision for the examination of the administrator, either in his own behalf or on behalf of his co-administrator; except that the 55th section 2 *R. S.* 92, allows the administrator to support by his own oath any item of expenditure not exceeding $20, by his swearing positively to the fact of payment, specifying when and to whom such payment was made; but it expressly provides that such allowances shall not in the whole exceed $500, for payments in behalf of any one estate. The 54th section, 2 *R. S.* 92, does not authorize the examination of an administrator, either on his own behalf or in behalf of his co-administrator. That section only contemplates an examination at the instance of the adverse party, and no other construction has ever been put upon it. The 55th section shows that the legislature must have intended this, as it forbids the establishment of payments of over $20 in any one item, and in the aggregate not exceeding $500; and by necessary implication, therefore, forbids the

idea that he can give evidence generally in regard to payments and as to the effects of the deceased which have come into his hands, and the disposition thereof.   It is no answer to this objection that Whitman Willcox, one of the administrators, was called for Mrs. E. B. Smith, one of the heirs, for Mrs. Smith had not filed any objections to the account; and besides, her husband was one of the administrators whose accounts were being contested; and as Whitman Willcox, jun. died in 1845, prior to any of our enabling statutes in behalf of married women, her husband was entitled to take whatever of personal property might come to his wife from that estate.   It was legally his and not his wife's.   It is entirely manifest that Whitman Willcox was examined in behalf and for the benefit of the administrators, and not the contestants.   The contestants object to his being sworn, and the whole course of his examination shows that it is the merest pretense in the world to allege that he was called for Mrs. Smith as heir.   He was called by Mr. Rexford, who appeared for both Smith and his wife—nominally for Mrs. Smith, but in reality for E. B. Smith, one of the administrators.   And an equally palpable error was committed in allowing E. B. Smith to be examined as a witness in behalf of his co-administrator, Mrs. Willcox, and Whitman.   And a more flagrant error was committed in. allowing Mrs. Willcox, the administratrix, to be examined as a witness in her own behalf and for Whitman, her co-administrator.

But it appears from the case that each of these administrators was not only allowed to give evidence for the other, but they were fully examined, not by the contestants, but by their own. counsel and in their own behalf, and their evidence, it seems from the case, must have had great control both with the auditor and surrogate upon the accounting.

There was an error committed in allowing B. F. Rexford to be sworn and examined as a witness in behalf of E. B. Smith, one of the administrators.   He is one of the sureties to the administrators' bond, and was interested to reduce the amount which might be decreed against the administrators on

Willcox *v.* Smith.

the final accounting, as it would thereby diminish his own liability. That the surety in such a case is an incompetent witness in behalf of the administrator is a proposition too plain to be discussed. It is a stubborn and inflexible rule that if a witness has a direct interest, however small, in the event of the cause, he cannot be admitted to testify upon the trial, in favor of that interest, in any respect or degree. (*Butler* v. *Warren*, 11 *John*. 57. *Hubbly* v. *Brown*, 16 *id*. 70. *id*. 195. *Smith* v. *Bradstreet*, 5 *Cowen*, 214, 215.) The decree of the surrogate on the final accounting of the administrators is conclusive evidence against the sureties, in an action on the administrator's bond. (2 *R. S.* 53, 116, § 19. 12 *Wend*. 492. 3 *McCord*, 225, 412. *Lucas* v. *Guy*, 2 *Bailey*, 403. *The Ordinary* v. *Coudry*, 2 *Hill's S. C. R*. 313. *Head* v. *Giles*, 12 *Pick*. 53. *The People* v. *Dunlap*, 13 *John*. 437.) And we so held in *The People, ex rel. Trowbridge*, v. *Judah Pierce and others, (in MS.)*

The following cases are referred to as authorities holding the sureties to this bond to be incompetent witnesses for the administrators on this final accounting. (*Niles* v. *Brockett*, 15 *Mass. R*. 378. 3 *J. J. Marsh*. 461. 1 *Cow. & Hill's Notes, p.* 109, *n*. 101. 7 *Martin's Lou. Rep*. 373. *Wood* v. *Skinner*, 6 *Paige*, 76. *Scott* v. *Young*, 4 *id*. 542. 5 *Watts*, 225, 228, 229. 1 *Phil. Ev*. 49. 5 *Serg. & Rawle*, 371. 5 *T. R*. 578. 5 *Cowen*, 215. 4 *John*. 293. 11 *id*. 57. 16 *id*. 92. 4 *Mass. R*. 653. 2 *Day*, 99. 9 *Cowen*, 128.)

There was another error committed, both by the auditor and the surrogate, in allowing the receipt of Elisha B. Smith as guardian of Mary Ann Merritt, given to himself as administrator, for one thousand dollars paid by himself as administrator, to himself as guardian of Mrs. Merritt. Such receipt furnishes no evidence for himself as administrator. He could not make any contract as her guardian, with himself as administrator, which can be binding on her. Neither can he, with one hand as her guardian, draw a receipt to himself as administrator, and pass it over into his other hand as administrator,

and claim it as evidence against his ward, of the payment of $1000, or as evidence of payment in his own behalf as administrator. The law will not permit him to act in such a double capacity. The great danger of imposition, in such cases, has induced courts of equity to indulge in the presumption of fraud, against such acts, although the fraud may be inaccessible to the eye of the court. (9 *Paige*, 242. 4 *Kent*, 3*d ed.* 438. *Parsons on Cont.* 74, 5.) He cannot bind Mrs. Merritt, his ward, when he acts thus in a double capacity. She is entitled to have her guardian free from such temptations, when he assumes to deal with her interests and bind her. The case in principle is analogous to that of an agent, who assumes to act for both parties in making a contract or transacting business; (*Parsons on Cont.* 74, 5; *Story on Agency*, §§ 9, 192, 211, 214, 210; *Dunlap's Paley on Agency*, §§ 33, 4;) in which case the law adjudges the contract or transaction presumptively fraudulent. This principle is applicable to all persons placed in situations of trust or confidence, and embraces trustees, executors, administrators guardians, agents, &c., &c. It embraces all who come within the principle. (9 *Paige*, 241, 242. 5 *Vesey*, 678. 1 *id.* 287. 2 *id.* 317. 1 *Russell & Myl.* 58. 2 *Myl. & K.* 819. 1 *Mason*, 341. 6 *Pick.* 196. 2 *John. Ch.* 252. 5 *id.* 38. *Hopk. Ch.* 515. 9 *Paige*, 237. 4 *Cowen*, 103. 8 *id.* 502. 9 *id.* 234. 12 *id.* 355. 1 *Bro. C. C.* 119. 5 *Paige*, 650. 2 *Myl. & Cr.* 574. 4 *id.* 134. 6 *Ves.* 625. 1 *Story's Eq. Jur.* § 315, 316. 2 *Mason*, 369. 1 *Jac. & Walker*, 294. 1 *John. Ch.* 27. 2 *id.* 394. 3 *Ves.* 740. 4 *Denio*, 575. *Angell on Fire and Life Ins.* 454, 455. *Parsons on Cont.* 74, 75.)

This receipt then was not a legal voucher for Mr. Smith, for the payment of this $1000, and the charge is not helped by his *ex parte* affidavit, annexed to his account. This affidavit and receipt are the only evidence introduced to sustain this claim of $1000; and both the surrogate and auditor committed an error in allowing it to be proved by such evidence.

This receipt is but an admission of the person making it,

and he cannot, as we have seen, make an admission for Mrs. Merritt, as guardian, in his own favor as administrator, to relieve himself from $1000, and charge it to her. Such a doctrine would subvert the rules of evidence, and make his own receipt in fact evidence in his own favor.

It is very questionable also whether Mr. Smith, as guardian, had any authority to pay over the capital of his ward's funds without the order of the court. In allowing the maintenance of the infant, the court usually confines itself within the limits of the income of the property, and certainly without the express sanction of the court, a guardian will not be permitted, of his own accord, to break in upon the capital. (*Dayton's Surrogate*, 634, 2*d* ed. 2 *Story's Eq. Jur.* § 1355. 1 *Myl. & K.* 627. *Stephens* v. *James, Jacob's Rep.* 193. *Loyal* v. *Farlie, id.* 265.) And I am inclined to think that the surrogate acted without jurisdiction in making that part of his decree wherein he directs that Mrs Merritt pay the amount found due from her to the persons named therein, and if not paid that it be a lien on her share of the Eli H. Willcox property. (2 *R. S.* 93, §§ 61 *to* 63. 2 *Selden*, 221.) Surrogates' courts are courts of special and limited jurisdiction. (3 *Barb.* 341. 1 *Hill*, 130. 10 *Barb.* 309, 523.) The extent of the surrogate's decree is limited by the statute to the particulars enumerated in section 65, 2 revised statutes, 93. (3 *Barb.* 341. 10 *id.* 309.)

The auditor allowed the certificates of third persons to be received in evidence to prove facts directly tending to vary and reduce the inventory. These certificates were introduced as vouchers. Now vouchers on the final accounting are made evidence for the admistrators only to show payments of debts and legacies, and of funeral charges, and just and necessary expenses. (2 *R. S.* 92, § 54.) These vouchers derive their entire competency and force, as evidence for the administrators, from the statute which allows them as evidence to prove the facts stated in the statute. These certificates were allowed for the purpose of showing the decrease of the estate ; that

debts inventoried as due the estate were not due, or only partly due; that they had been reduced by payments made to Whitman Willcox, jun., in his lifetime. They cannot be received as evidence to prove such facts. They are vouchers in the administrators' hands only of the payments made by them, and are then limited to the class of facts specified in the statute, to wit: payment of debts, legacies, funeral charges, and just and necessary expenses. (2 *R. S.* 92, § 54.) These certificates are not made evidence by being accompanied, some of them, by the affidavits of the persons giving the certificates ; for the affidavits are extra judicial, and are not evidence. (2 *Cow. & Hill's Notes, p.* 944, *note* 689.) It is very clear to my mind, that these certificates and extra judicial affidavits of the persons making them, are not evidence to decrease the estate, or reduce the assets as fixed by the inventory and affirmed by the oaths of the appraisers and administrators. The inventory is made by sworn appraisers, in pursuance of the statute, and the administrators take and subscribe an oath to be attached thereto, to the effect that it contains a full statement of all the personal property of the deceased which has come to their knowledge, and that it is in all respects just and true, &c., (2 *R. S.* 85, § 16,) and the inventory must contain a statement of the securities belonging to the estate, and the amount collectable on each security. (2 *R. S.* 84, § 11.) The general rule undoubtedly is that the administrators are prima facie accountable for the whole amount of the inventory at its appraised value. (*Dayton's Surrogate,* 248, 267, 268 *and* 269. 2 *Kent's Com.* 515, 516, 8*th ed.;* 415, 3*d ed.* 2 *Bradf. Sur. R.* 221. *Wright's Executor's Guide,* 92, 104, 114. 2 *R. S.* 82, §§ 4, 5, 6, 11. 3 *id.* 640, § 10, *note.*) And the debts inventoried and not designated as desperate must be accounted for as assets in the hands of the administrators, or good cause shown for not collecting them. (*Wright's Ex. Guide,* 92, 104, 114. 2 *Bradf. Surr.* 220. 11 *Wend.* 361.)

I concur with my brother Balcom in opinion, that the item of $5512.20, charged in Mrs. Smith's account for moneys paid

Willcox *v.* Smith.

Eli H. Willcox, were improperly allowed by the auditor and surrogate, for the reasons stated in the opinion of Justice Balcom, and for the additional reason that testimony was improperly allowed to prove this item, and it is not proved by other evidence.

The statute of limitations furnishes a complete bar to Mr. Smith's claim for the two notes of $735.59 and $800, paid by him at the Chenango Bank, July 8, 1845, and in October, 1845 ; (*Treat* v. *Fortune,* 2 *Bradf.* 116 ;) and besides, the inventory furnishes presumptive evidence, at least, that this claim, if it ever existed, had been extinguished.   And in addition to this, the confession of the judgment by Smith on 17th May, 1847, for $3000, in favor of this estate, is *prima facie* evidence to rebut the existence of any such claim.   And indeed it is a most solemn admission of an actual indebtedness, on his part, to this estate, of that amount, if it is not conclusive upon him.   (5 *Denio,* 304.   2 *Selden,* 461.)   And if we strike out the evidence of Mr. Smith and Rexford, as we have seen that we are obliged to do, there is no evidence in the case to overcome the effect which the law attaches, in its presumptions, to that judgment.

DECISION.    Decree of the surrogate *reversed;* and the whole case referred back to be reheard before the county judge of Chenango county, acting as surrogate ; and ordered that the costs of Mary Ann Merritt, Bradford Willcox and Charles Willcox in the surrogate's court, as well as their costs on the appeals to this court, and also the fees of the auditor, be charged upon and paid out of the estate of Whitman Willcox deceased, in the hands of the administrators and administratrix ; and that the costs of the administrators and administratrix in the surrogate's court (except the fees of the auditor and surrogate) as well as their costs on the appeals to this court, be borne by them personally ; and that Rexford, Mygatt and Snow pay their own costs on the appeals to this court.

[BROOME GENERAL TERM, January 5, 1858.   *Gray, Mason* and *Balcom,* Justices.]