Seaman *v.* Duryea.

ORANGE SPECIAL TERM, February, 1851. *Brown,* Justice.

SEAMAN *vs.* DURYEA and others.

Surrogates' courts are courts of peculiar and special jurisdiction. Created by the statute, they can exercise such powers only, as the statute gives them. The authority to do certain acts, or to exert a certain degree of power, need not be given in express words. If the authority may be fairly and reasonably inferred from the general language of the statute, or if it be necessary to accomplish its objects, and to the just and useful exercise of the powers which are expressly given, it may be taken as granted.

Where a guardian of the estate of an infant under the age of fourteen years is appointed by the surrogate, and when the infant arrives at the age of fourteen such guardian is superseded in his trust by an order of the surrogate, and a new guardian is appointed in his place, and proceedings are taken to compel the former guardian to account, the surrogate has the power not only to ascertain and declare the quantity, quality and condition of the ward's property, and the balance due to him from the guardian, but to decree and adjudge the time when, the person to whom, and the manner in which, the same shall be paid or delivered over.

Seaman *v.* Duryea.

And the surrogate has the power to enforce obedience to such a decree by process of attachment against the person; notwithstanding the act to abolish imprisonment for debt.

Whatever power surrogates had to enforce their decrees, previous to the passage of the act of May 16, 1837, is confirmed and enlarged by force of the provisions of that act.

The relation which a guardian maintains to his ward is not that of a contract debtor to his creditor. Where he has received the money of his ward, the law will doubtless raise an implied promise to pay it over, when the latter arrives at age, if he chooses to bring an action of assumpsit. But the guardian can not by any act of his, change his duties and liabilities from those of a trustee to those of a mere contract debtor.

The order and process of commitment for contempt, in surrogates' courts, must be similar in form to those used in courts of record.

If it be just and lawful that a trustee, upon the expiration of his trust, should pay and deliver over the trust money, or property to his successor, or to his *cestui que trust,* then the tribunal or officer having the direction and control of his conduct has the right to make an order or decree that it shall be done.

The power of a surrogate to make a decree against a guardian, is not limited to the cases where there are specific property or securities to be transferred and delivered over; but applies equally to cases where money is to be paid over.

THIS cause came on for argument on demurrer to the answer of the defendants to the complaint of the plaintiff. The complaint stated that on and before the 26th of June, 1848, the plaintiff with his wife and children, resided in the city of New-York, and carried on business there, by means whereof he maintained himself and his family who were dependent upon him for support. That on the said 6th of June aforesaid, the defendants, without any reasonable cause, &c., forcibly seized the plaintiff, and carried him to the common jail of the county of Orange, and there by force kept and imprisoned him, until the 17th day of January, 1849, and until he was enlarged from said imprisonment, by the judgment and order of the supreme court, upon a writ of *habeas corpus,* duly prosecuted to that end by the plaintiff. The complaint also alledged the loss of business, and means of support; expenditure of money, loss of fame and credit by the plaintiff, in consequence of the said arrest and imprisonment; and demanded judgment against the defend-

Seaman v. Duryea.

ants for ten thousand dollars. The defendants *Duryea*, *Booth*, and *Welling*, put in a joint answer, admitting the plaintiff's residence in the city of New-York, denying the arrest and imprisonment, and liberation, as stated in the complaint; and for further answer alledging that the plaintiff was duly appointed the guardian of one of the defendants, Josiah Mead, by the surrogate of the county of Orange, on the 29th September, 1834; that the plaintiff accepted the appointment, took upon himself the execution of the office, and became possessed of money or other property belonging to Mead, of considerable amount; that afterwards, on the 17th May, 1839, (Mead having then arrived at the age of 14 years and upwards,) Peter Ball of said county of Orange was appointed the guardian of Mead, by the surrogate of the county of Orange; and took upon himself the execution of the office; and afterwards, on the 13th May, 1844, presented his petition to the surrogate, stating that the plaintiff had not accounted for any moneys which had come into his hands as such guardian, and praying that he might be required to appear before the surrogate, and render an account as guardian; that a citation for that purpose was personally served on the said plaintiff, and such proceedings had thereon, that on the 9th of July, 1844, the surrogate of said county of Orange made a decree, ordering, amongst other things, that the plaintiff pay to Ball, the then guardian, the sum of $427,39, within thirty days from the service of a copy of the decree upon the plaintiff, and interest on the same from the date of the decree; and that upon complying with the decree, the plaintiff be discharged from further liability, and the account taken be deemed final and conclusive upon all the parties to that decree; that on the 30th December, 1844, a copy of the decree was served personally upon the plaintiff; that the defendant Mead, attained his majority on the 19th June, 1844; that "afterwards on the 17th April, 1848, Daniel B. Boice, duly appointed the attorney of the said Peter Ball as such late guardian as aforesaid and of the said Josiah Mead, for such purposes, personally served" upon the plaintiff, a copy of the decree and demanded payment of the moneys ordered in the decree, to be paid by the

plaintiff " as the late guardian, to the said Peter Ball named in the decree as the present guardian of the said Josiah Mead ;" that the plaintiff neglected and refused to pay ; that on due proof of the service of decree, demand of payment, and refusal and neglect to pay, as above stated, an order in the matter was made by Benjamin F. Duryea, surrogate of the county of Orange, on the 31st day of May, 1848, that an attachment issue out of, and under the seal of the said surrogate court, against the plaintiff, to be directed to the sheriff of the city and county of New-York, returnable before the said surrogate at his office in Goshen, on the 26th day of June then next, to answer for his misconduct in not paying the money mentioned in the decree so served on him. The answer also set out the attachment in full, and stated further, that the attachment was served by a special deputy of the sheriff of New-York ; that the plaintiff was arrested and gave bail pursuant to the directions indorsed on the writ ; that the same was duly returned ; that the plaintiff on the return day, " by virtue of the said attachment came personally before the said surrogate, and denied the misconduct alledged against him ;" that, pursuant to the order thereupon made by the said surrogate, the defendants Ball and Mead, forthwith filed interrogatories, and the plaintiff put in written answers thereto under oath ; that thereupon an order was made by the said surrogate, in the said matter, that the plaintiff pay to the said Josiah Mead, the sum of money above mentioned, and that the plaintiff " be directed to stand committed to the common jail of the county of Orange, there to remain charged upon the said contempt, until he should pay the said sum of money last mentioned, with interest thereon from the 9th day of July, in the year 1844, with the fees of the sheriff, unless the said court should see fit sooner to discharge him, or he be discharged by the course of law, and that a warrant for that purpose issue to the sheriff of the county of Orange." That in pursuance of that order the said surrogate on the same day issued, under the seal of the said surrogate court, a precept (which was set out in full in the answer) directed to the sheriff of the county of Orange, commanding him to take the body of

Seaman *v*. Duryea.

the plaintiff and him safely and closely keep in his (the sheriff's) custody in the common jail of the county, until he should pay the said sum of money before specified, with the sheriff's fees, or until the said court should make an order to the contrary, or the said plaintiff be discharged by due course of law. That the defendant Edward L. Welling, then sheriff of the county of Orange, under and by virtue thereof, as he had good right and full authority to do, took the plaintiff into his custody and kept him in such custody until the 25th November, 1848, when the plaintiff was taken before the Hon. David W. Bate, judge of the county court of Orange county, a counsellor &c. under a writ of *habeas corpus* issued by the said judge; and that the plaintiff was on the same day, by an order of the same judge, (and which is set forth in full in the said answer) remanded to the custody of the said sheriff; that he remained in such custody until the 17th January, 1849, when he was discharged, as alledged in said complaint. The answer further alledged that the defendants had not sufficient knowledge to found a belief as to the other matters stated in the complaint, and demanded to be dismissed from the action with their reasonable costs and charges.

The plaintiff demurred to this answer, as not constituting any sufficient defense in law to the plaintiff's complaint.

The defendant Josiah Mead put in a separate answer, setting up, substantially, the same defense as his co-defendants. To this answer, the plaintiff also demurred, on the like grounds, as in the demurrer to the joint answer.

*Butler & Evarts,* for the plaintiff.

*S. J. Wilkin* and *W. C. Hasbrouck,* for the defendants.

Brown J. John Seaman, the plaintiff, was the guardian of the estate of the defendant Josiah Mead, appointed by the surrogate of the county of Orange. After Mead attained the age of fourteen years, Seaman was superseded in his trust, by an order of the surrogate, and Peter Ball appointed in his place. Proceedings were taken to compel him to account. Process for that purpose was duly served upon Seaman, who appeared and

litigated the questions arising upon the accounting : and, on the 9th of July, 1844, the surrogate made a decree, that Seaman pay to Ball, the new guardian, $427,37, so much money in the hands of Seaman, and which he had received as guardian: and that, upon complying with such decree, he should be discharged from all further liability on account of the trust. The jurisdiction of the surrogate over the subject matter of the decree, and his power to compel the account, is given by §§ 9, 10 of the act concerning guardians and wards, (*R. S. part* 2, *ch.* 8, *title* 3. 2 *R. S. 2d ed.* 84, 85,) and is not disputed. But it is said that his authority is limited to the taking and stating the accounts, and establishing the amount in the guardian's hands ; and does not extend to the making of a decree for the payment of the money. For authority in favor of this position, I am referred to the published opinion of Mr. Justice McCoun, given in the matter of John Seaman, when brought before this court upon a *habeas corpus*, and to the absence of express authority in the statutes defining the powers and jurisdiction of the surrogate, and the surrogate's court.

Surrogates' courts are " courts of peculiar and special jurisdiction." Created by the statute, they can exercise such power only as the statute gives them.(*a*) The authority to do certain acts, or to exert a certain degree of power, need not be given in express words. If the authority may be fairly and reasonably inferred from the general language of the statute, or if it be necessary to accomplish its objects, and to the just and useful exercise of the powers which are expressly given, it may be taken as granted. The 10th section of the act concerning guardians and wards, (2 *R. S.* 85, 2*d ed.*) provides that " any guardian appointed by any surrogate, may be cited to account before the surrogate who appointed him," and, " may be compelled to account in the same manner as an administrator." Administrators are required to account, under § 52 of the act concerning " *the duties of executors and administrators, in*

(*a*) See the case of *Wilson and Thompson, exr's &c. appellants,* v. *the Baptist Educational Society, respondents,* (*ante, page* 308.)

Seaman *v.* Duryea.

*rendering an account,"* &c. (2 *R. S.* 32, 2*d ed.*) The 71st section, (*page* 35,) provides that when the account shall be rendered, and it appears that any part of the estate remains to be paid or distributed, the surrogate shall make a decree for the payment and distribution of what remains, to those who may be entitled thereto. The act in relation to guardians and wards contains no similar direction, for the very obvious reason that the money in the hands of a guardian, upon the decree to settle the account, is to be paid to the ward, if of age, or to the new guardian, if he is not. Whereas, in the case of an administrator, the distribution is sometimes to classes in their order of priority, and at other times it is *pro rata* amongst all; or to a particular class, whose rights are to be adjusted and ascertained by the decree. The words, "cited to account," and "compelled to account in the same manner as an administrator," in the 10th section of the act in relation to guardians and wards, to which I have referred, mean something more than merely to exhibit and determine the true condition of the trust property. Such a construction would be narrow and illiberal; for the power to compel an account, without the power to make a decree for the payment and delivery over of the trust property, would be an idle and profitless proceeding. Whenever an executor, or administrator, accounts before the surrogate, he not only exhibits an account of his receipts and disbursements, and the condition of the assets unadministered, and has the balance in his hands ascertained and declared, but the same decree also declares the disposition he shall make of it, the persons to whom, and the time when, it shall be delivered over and paid. This is the manner in which administrators are compelled to account. And the language quoted from § 10, can mean nothing short of a decree to be made, which shall ascertain the quantity, quality and condition of the ward's property in the hands of the guardian, and decree and adjudge the time when, the person to whom, and in what manner it shall be paid or delivered over. This view derives confirmation from the 7th subdivision of § 1 of the act concerning surrogates' courts, (2 *R. S.* 154, 2*d ed.*) which declares that the surrogate shall have power, within the limits of

Seaman *v.* Duryea.

the county for which he is appointed, " to appoint guardians for minors, to remove them, to direct and control their conduct, and to settle their accounts, as prescribed by law." The power to direct and control the conduct of guardians, can not be a barren power. To direct and control, is to govern and to command, and the authority to appoint and to remove guardians, or other trustees and to direct and control their conduct, given by law to a court of justice, must comprehend the power to compel them to do whatever the law requires they should do, or it comprehends nothing. If it be just and lawful that a trustee, upon the expiration of his trust, should pay and deliver over the trust money or property to his successor, or to his *cestui que trust,* then the tribunal or officer having the direction and control of his conduct, has the right to make an order or decree that it shall be done. The opinion of Mr. Justice McCoun concedes this power to the surrogate, in cases where there is specific property or securities to be transferred and delivered over; the transfer and surrender of which, he says, may be enforced by attachment. This concession, if it contain a correct exposition of the law, covers the whole ground of dispute; because there is no separate and independent authority given to make a decree for, and enforce the transfer of, specific property or securities. If the power exists at all, it is by force of the sections to which I have referred, which must be construed to include money, as well as securities for money or specific property. In *Skidmore* v. *Davies & Shaw,* (10 *Paige,* 317,) the chancellor decided that upon the removal of a guardian, it is a matter of course to require him to account and pay over to his successor, the balance, if any, which shall be found in his hands, upon accounting; and that an appeal from the surrogate's order of that kind, could only have been for the purpose of delay. I can not, therefore, doubt the power of the surrogate, in the present case, to make the decree of the date of the 9th July, 1844, set up in the answer, requiring Seaman to pay over the sum of money, at the time, and in the manner therein mentioned.

I am next to consider, whether the surrogate had authority to enforce obedience to the decree, by process of attachment

against the person. The 4th suddivision of section 6, of the act in regard to surrogates' courts, (2 *R. S.* 155, 2*d ed.*) declares that the surrogate shall have power " to enforce all lawful orders, process, and decrees of his court, by attachment against the persons of those who shall neglect or refuse to comply with such orders and decrees, or to execute such process." Orders, process and decrees, comprehend the entire proceedings in any given matter, petition, or application, which affect parties, witnesses, and officers. It is quite apparent that the language of the 4th subdivision is not limited in its application, to enforce obedience to subpœnas, to compel witnesses to give evidence, to the preservation of order during any judicial proceeding, nor to enforce orders, which require the production of wills, or other papers, or the filing of inventories; nor to compel the appearance of parties; because the performance of the latter class of duties is expressly provided for under the name of orders and process, in the 4th subdivision; and the former in the 2d and 6th subdivision of the same section. The laws which reorganized and remodelled the surrogate's court, and which regulate its proceedings and practice, took effect on the 1st January, 1830; and, from that time, until the passage of the act of the 16th May, 1837, concerning " the proof of wills, executors and administrators, guardians and wards, and surrogates' courts," (*Sess. Laws of* 1836, *p.* 524,) no execution could issue upon a decree rendered therein. So that unless decrees for the payment and delivery over of trust money, or property, by executors, administrators, and guardians, are the " lawful decrees," which that court may enforce under the 4th subdivision, there were no means provided by law, short of the judgment of some other court, by which they could be carried into effect. The decrees of surrogates' courts were mostly of this character, and I think the main, if not the sole object of the 4th subdivision of § 6, was to provide means to ensure their performance. The legislature did not invest these courts with ample and almost exclusive jurisdiction over a certain class of trusts, and at the same time withhold the means to enforce obedience to the decrees they might make. If a decree provides for the surrender

and delivery of specific property, or the transfer of securities which the guardian has in his possession, or under his control, the opinion of Mr. Justice McCoun to which I am referred is an authority that "the coercive remedy in such cases is an attachment, as for a contempt, founded on the refusal to do the act required." The power to enforce the performance of a surrogate's decree by attachment against the person—if it exists at all—exists by force of the 4th subdivision of § 6; and that does not discriminate between decrees for the payment of money, and those for the transfer and delivery of specific property. The 63d and 64th sections of the act of the 16th May, 1837, before referred to, (*Session Laws of* 1837, *page* 535,) provide that the certificate of a surrogate's decree for the payment of money, by an executor, administrator, or guardian, may be filed with one of the clerks of the supreme court, and docketed as a judgment, upon which execution may be issued in the usual form, as though it was a judgment therein obtained. This is said to take away the power to proceed by attachment against the person, because the 3d subdivision of the first section of the act concerning "proceedings as for contempts to enforce civil remedies, and to protect the rights of parties in civil actions," (2 *R. S.* 440, 2*d ed.*) provides for the punishment of parties, by fine and imprisonment, for the non-payment of money, in those cases only where by law execution can not be awarded. The parties here spoken of, are parties to civil actions pending in courts of record, and the act relates exclusively to courts of record. The surrogate's court is not a court of record, nor are the proceedings taken there against the class of persons, over whom it exercises jurisdiction, civil actions in the legal sense of the term. Its powers to punish for contempts, are not derived from this statute, but exist independently of it. It conferred no power on the surrogate, and its repeal could take none away. I see nothing in the act of the 16th May, 1837, which indicates an intention to impair existing remedies, but some of its provisions have an opposite tendency. The 66th section makes provision for the issuing of attachments authorized by law, to enforce orders, and decrees, by the surrogate of one county, to the

officers of any other county to be executed, and for the arrest of the person against whom such process is issued, and his conveyance to the place where it may be returnable. And § 67 provides for the return of such attachments, and the giving of a bond upon the arrest, as prescribed in §§ 10, 12 and 13 of the act in regard to proceedings for contempts. (2 *R. S.* 442, 2*d ed.*) Such power, therefore, as the surrogate had to enforce his decrees, previous to the passage of the act of 16th May, 1837, is confirmed and enlarged by force of its provisions.

It must not be forgotten, that when the statute, which defines the powers and jurisdiction of the surrogate's court, took effect, the law of imprisonment upon process in civil actions was in full force. To arrest and imprison the person of a party against whom a decree or judgment for the payment of money had been obtained, was one of the usual and ordinary remedies at the command of the creditor. The 1st section of the "act to abolish imprisonment for debt, and to punish fraudulent debtors," passed April 26th, 1831, (*Session Laws of* 1831, *page* 396,) takes away the remedy by imprisonment on civil process, in suits and proceedings for the recovery of money due upon judgments, or decrees "founded upon contract, or due upon any contract, express or implied." Unless the judgment or decree is founded upon a contract, or the money is due upon a contract express or implied, the act affords no protection, and the power to imprison remains the same as before it was passed. The relation which the guardian maintains to his ward, is not that of a contract debtor to his creditor. Where he has received the money of his ward the law will doubtless raise an implied promise to pay it over, when the latter arrives at age, if he choose to bring his action of assumpsit, and give the transaction that aspect. But there is no act of the former, I apprehend, that can change his duties and liabilities, from those of a trustee to those of a mere contract debtor. The debtor who acquires money upon a loan, or merchandise upon a contract of sale on credit, does so with the intention, and express understanding, of applying it to his own use, at his own pleasure, and of employing it in his own business, for his own emolument; and the

Seaman *v.* Duryea.

hazard of his ability to pay when the term of the credit has elapsed, enters into the essence of the contract. The guardian takes the property, or the money, of the ward, with no such understanding. His trust is one of obligation and duty, and not of speculation and profit. He can not mingle the trust money or property with his own, or convert it to his own use, however honest and sincere may be his purpose to restore it when wanted. (2 *Kent's Com.* 229, 230. 2 *Story's Eq. Jur.* § 1270. *Schieffelin* v. *Stewart.* 1 *John. Ch. Rep.* 620.) He is to hold the one and invest the other for the profit of his ward, and to have the property and the money, or the securities which represent the money, at all times subject to such order as the court, from which he derives his office, may see proper to make. If the order is to deliver over the property, transfer the securities, or pay the money to the ward, when of age, or to the new guardian when he is not ; the law assumes his ability to do what the obligations of his duty require he should do, and he can not evade his responsibilities, and change his position as a trustee, into that of a mere contract debtor, by the allegation real or pretended, that the trust property has been converted to his own use. The 2d section of the non-imprisonment act declares, that its provisions shall not extend to contempts to enforce civil remedies, and the act of the 9th May, 1846, (*Sess. Laws of* 1846, *p.* 164,) provides that in actions upon contract for moneys received by male persons in a fiduciary capacity, the defendants " shall be liable to imprisonment in the same manner as in actions for wrongs." These several enactments indicate no disposition to relax the law of imprisonment, in regard to trustees made liable for trust property.

The plaintiff next insists that the proceedings and process, under which he was arrested and imprisoned, afford no defense to the action, because the contempt is not specially and plainly charged in the warrant of commitment. He relies upon the 3d subdivision of § 42, of the act relating to writs of *habeas corpus, certiorari, &c.* (2 *Rev. Stat.* 470, 2d *ed.*) which directs that the officer, before whom the party shall be brought on such writ, shall remand him, if it appear he is detained for any contempt

Seaman *v.* Duryea.

specially and plainly charged in the commitment ; and upon the 3d subdivision of § 43, (2 *R. S.* 470, *2d ed.*) which directs his discharge, " when the process is defective in some matter of substance required by law, rendering such process void." These provisions, however, must be construed in connection with §§ 23 and 24 of the act concerning " Proceedings as for contempts to enforce civil remedies," &c. (2 *R. S.* 444, *2d ed.*) which declare, that " when the misconduct complained of, consists in the omission to perform some act or duty, which it is yet in the power of the party to perform,"—" the order and process of commitment shall specify the act or duty to be performed, and the amount of the fine and expenses to be paid." This last act regulates proceedings for contempts in courts of record exclusively, but the 4th subdivision of § 6 of the act which authorizes attachments by surrogates, (2 *R. S.* 155, *2d ed.*) provides that they "shall be in form similar to that used by the court of chancery in analogous cases ;" so that the order and process of commitment in the surrogate's court, and in the courts of record, must be similar in form. The plaintiff was arrested by virtue of the attachment set out in the answer, issued and tested on the 31st May, 1848, and directed to the sheriff of the city and county of New-York. It recites the claim of the 9th of July, 1844, made against him as the late guardian of the defendant Mead, for the payment of the sum of $427,37, within 30 days from the time of the service of a copy of the decree. It also recites the due service of the decree, a demand of payment of the money, the lapse of the 30 days, and the omission to pay. He gave a bond for his appearance in the usual form, and in pursuance thereof, on the 26th June, 1848, the return day of the attachment, he appeared before the surrogate and was examined upon interrogatories ; and thereupon the surrogate made another order, that he be committed to the common jail of the county of Orange, there to remain, charged with the contempt, until he should pay the money, with the interest and fees. The process of commitment was issued and tested on the same day. It also recites the order of the 26th June, 1848, by which Seaman was ordered to pay Josiah Mead, who had then attained the age of 21 years, the sum of

Seaman v. Duryea.

$427,37, with the interest, and that he be committed to the common jail of the county of Orange, there to remain charged with the contempt mentioned in the order, until he should pay such money, and that a warrant issue for that purpose. The command of the process to the sheriff is, that he take the body of Seaman and keep the same in his custody, in the common jail of the county, until he pay such money, or until the court make an order to the contrary, or he be discharged by due course of law. The misconduct complained of, consisted in the omission to pay the money mentioned in the decree, and the order and process specified the act or duty to be performed, and the sum to be paid, and the duration of the imprisonment. Both the order and the process are, in my judgement, in strict and literal conformity with the requirements of §§ 23 and 24 of the act in regard to " proceedings. as for contempts, to enforce civil remedies," &c. *The People* v. *Nevins*, (1 *Hill*, 155,) is an authority in favor of this position. The defendant was an attorney of this court. Proceedings were taken against him by attachment, and he was committed to the custody of the sheriff of the county of Erie, by authority of a rule entered upon the minutes of the court, which imposed upon him a fine, sufficient in amount to indemnify the relator for money collected by the defendant for him, to be ascertained by the report of the clerk, and which directed him to remain in custody until such sum, with the costs and expenses of the commitment, should be paid. The report of the clerk was filed, on the day after the rule was entered, and ascertained the sum to be paid, at $860,60. He was discharged from his imprisonment by a commissioner, upon *habeas corpus*, on the ground of the insufficiency of the process of commitment. The proceedings were then brought into this court to be reviewed on *certiorari*, and it was adjudged, (page 158,) that "the sum for the non-payment of which a man is commited for contempt, should no doubt be specified by the rule, but that may be directly, or by reference to a proceeding taken to ascertain the amount through the proper officer, whose report, on its being filed and confirmed, becomes the act of the court, and may be read as part of the rule." And that as the duty to be performed,

and the duration of the imprisonment, were both specified in the rule, it was a substantial, if not a literal compliance with the requisites of §§ 23 and 24 of the act in regard to "proceedings as for contempts, to enforce civil remedies," &c.  I can see no difference in the form or sufficiency of the commitment, between the case of the *People* v. *Nevins*, and that under consideration, except that in the former it was by a rule, and in the latter by a warrant.

  。 Judgment must be entered for the defendants upon the demurrer, with leave to the plaintiff to withdraw the demurrer and reply within twenty days, on payment of costs.

Judgment accordingly.

