By the Surrogate.
The question presented for consideration is, what, if any, interest have these widows in the proceeds of the sale.
Section 72 (3 Rev. Stat. [5 ed.], 198), provides that “the proceeds of a sale of real estate made in pursuance of an authority given by any last will may be brought into the office of the surrogate before whom such will was proved, for distribution ; and the surrogate shall proceed to distribute the same in like manner and upon like notice as if such proceeds had been paid into his office in pursuance of an order of sale of real estate for the payment of debts.”-
Where land is sold by order of the surrogate to pay debts, the statute directs that after paying the expenses of sale, &c., he shall next satisfy any claim of do.wer which the widow of the testator or intestate may have upon the land so sold, &o. (3 Rev. Stat. [5 ed.], 104, § 45).
Section 52 provides that “if after the payment of debts and expenses there be any overplus of the proceeds of the sale, the same shall be distributed among the heirs and devisees of the testator or intestate, or the persons claiming uhder them, in proportion to their respective rights in the premises sold.”
*232 Now, it is quite certain that the title to the lands sold vested, immediately .at the testator’s death, in the ' devisees, by virtue of the will, and so remained until the power to sell, conferred upon the executors, was exercised. There was a seizin in deed, or in law, of the devisees. If therefore a husband, who was a devisee or belonged io the class of devisees, died during his seizin and before sale, it seems to me the wife was entitled to dower (4 Kent Com., 41). A seizin in law is as effectual asan actual seizin (2 Bl. Com., 131; Clancy’s Rights of Women, 198).
The devisees had an estate of inheritance in the lands—a base fee—not a fee simple (2 Bl. Com., 109). A base, or qualified fee is such an one as hath a qualification subjoined thereto, and which must be determined whenever the qualification to it is at an end. It is a limited fee—and the estate is a fee, because by possibility it may endure forever in a man and his heirs (1 Shars. Bl. Com., 109). And the widow is entitled to be endowed of all lands and tenements of which her husband was seized in fee simple or fee tail, at any time during the coverture, and of which any issue, which she might have had, might by possibility have been heir (Id., 131; Litt., § 53 ; Washburne on Real Prop., 154).
It is plain in this case that there was a possibility of the surviving executor dying without having exercised the power of sale, and then there would have been an estate in fee simple absolute, in the devisees, their heirs and assigns forever.
Thus it is abundantly established that the widows in question were endowed of these lands to the extent of the seizin of their respective husbands.
The title thus vesting in the devisees, when one of these devisees died leaving .a widow and children, and the land having been sold under "the authority contained in the will, it seems to me the proceeds of the sale are to *233 be regarded as land and that the widows should take their respective one-third for life. Although Chancellor Kent says that “In equity, lands agreed to be turned into money, or money into lands, are considered as that species of property into which they were agreed to be converted, and the right to dower is regulated in equity, by the nature of the propérty in the equity view of it” (4 Kent Com. 50), yet in law as well as in equity the proceeds of the sale of the lands in this case, are, I apprehend, to be treated as if they were lands. The statute, it will be seen, directs their distribution in the same manner as if they were proceeds arising from a sale of the lands ordered sold by a surrogate to pay debts. It is true the chancellor says at page 57, “If an estate be conveyed to such uses as the purchaser by deed or will should appoint, and in default of appointment, to the purchaser in fee, it is settled that the estate vests in the purchaser as a qualified fee, subject tó be divested by an exercise of the power (for the power is not merged in the fee), and, consequently, dower attaches. It has been a questionable point, whether a subsequent exercise of the power, as being a prior or paramount right, would not dislocate and carry with it the dower of the purchaser’s wife. The better opinion is that the dower is defeated by the execution of the power,” Here the dower is not defeated by such a paramount title and right of seizin as is referred to by Washburne at page 239. At 208 of his able work on Real Property, he says, however, “If lands which have descended to an heir are sold for payment of the ancestor’s debts, or by an executor under a power in the will of the testator, the seizin of the heir or devisees, although completed by entry, will thereby be divested, and the right of dower in his wife defeated.” To sustain this position he cites as authorities, cases in the courts of the States of Ohio, Pensylvania, and North Carolina, which I have not *234 been able to consult. It may, however, be sufficient to say, that in either case the heir and the widow are-both undoubtedly divested of their estate or interest in the lands, and a good title obtained by the purchaser, and it is equally certain, that when the object of the sale has been accomplished, the heir or devisee has an interest in the surplus proceeds.
The statute of our own State, as has been shown, does divest the title of the heir or devisee, as well as that of the widow, in the land sold under an opder of sale to pay debts, but at the same time, secures the interest of the widow and the heir or devisee, in the proceeds of the sale, and vests a good title in the purchaser. The widow is to receive a sum in gross, if she so elect, in lieu of her dower interest in the land sold, or will have one-third part of the purchase money put at interest for her benefit as dower. A widow is in the care of the law and a favorite of the law. It may be laid down as an almost universal proposition, that where estates, out of which widows were entitled to dower, have been sold by order of court, or have been so sold as to give courts of equity jurisdiction over the money, these courts will allow the widows dower out of the money (1 Washburne on Real Prop., 243). And this court has equity powers within the scope of its statutory jurisdiction. Appeals from its decisions were formerly made directly to the court of chancery, and since the peculiar powers of that court have been transferred to the supreme court, such appeals are taken to' the equity side of the latter court. As has been shown, ' these widows were entitled to dower in the lands sold, and this court has jurisdiction over the proceeds of the sale.
I reach the conclusion, therefore, that the widows of devisees who have died seized of an estate of inheritance in the lands in question should be allowed their dower out of the moneys to be distributed.
*235 II. January, 1874.
On May 3, 1872, a decree was made in the above matter directing the sole surviving executor among other things to pay to John C. Timpson a devisee of deceased some four thousand and forty dollars and ninety-eight cents, the executor then having the money on hand. About July 12, 1873, an application was made on behalf of the devisee, alleging a demand of and refusal to pay his distributive share of the proceeds of sale of real estate, for a citation directing the executor to appear and show cause why he did not pay it, or show cause wl^ an attachment should not be issued against him. The citation was issued returnable August 18, 1873. He ultimately appeared and alleged as cause that he had no funds wherewith to pay. That when he had the money he sought to find the devisee but could not do so, and subsequently was so unfortunate as to mingle the funds with his own or convert them to his own use, and lost the whole.
The court afterwards issued an attachment against the executor directing that he should be brought before the court to answer as for a contempt in not having complied with the direction contained in the decree. The attachment was served and the parties appeared in, court, interrogatories' and answers thereto were duly filed, from which it appeared that the executor had converted the fund and it was lost, and counsel discussed and submitted the question as to whether.the facts and law gave the surrogate jurisdiction to issue a precept for the imprisonment of the executor.
S. M. Ostrander, for legatee.
D. R. Jacques, for executor.
By the Surrogate.
Subdivision 4, section 1, 3 Rev. Stat. [5 ed.] 362, provides that every surrogate shall *236 have power to enforce the payment of debts and legacies, which power shall be exercised in the cases and in the manner prescribed by the statutes of this State.
Section 10, p. 364, gives the surrogate power “ To enforce all lawful orders, process and decrees of his court by attachment against those who shall neglect or refuse to comply with such orders and decrees, or to execute such process, which attaqhment shall be in form similar to that used by the court of .chancery in analogous cases.”
Section 21, p. 366 (Laws of 1837), makes attachments, &c., returnable to the county where they are issued, and also makes applicable to attachments issued by surrogates, 3 Rev. Stat., 5 ed., §§ 10, 11, 12, 13 and 16-32, inclusive, pp. 851-853.
It seems to be pretty well established by authority, that surrogates' courts are not courts of record, notwithstanding the case In the Matter of Latson, 1 Duer, 696.The authorities holding a'contrary doctrine are Seaman v. Duryea (10 Barb., 523 ; Dayton on Sur., p. 6); Doran v. Dempsey (1 Bradf., 490); In the Matter of Watson (3 Lans., 408). Concurring fully with these authorities upon this point, it is very plain that none of the provisions on pages 840-855, inclusive (3 Rev. Stat.), are at all applicable to surrogates’ courts, except the sections above quoted. Were it otherwise, where was the necessity of the act of 1837, making those sections applicable to these courts. Subdivision 3 of section 1, p. 849, providing that attachments may issue against persons for the non-payment of any sum of money ordered by “ such court” in cases where, by law, execution cannot be awarded for the collection of such sum, refers to and affects courts of record only, and has no application here.
Although, by the act of 1837, provision is made for the docketing of surrogate’s decrees with the clerks of the supreme court, and for the issuing of execution *237 thereon, surrogates have still the power to enforce obedience to their decrees by attachment. This power was conferred upon them by the Revised Statutes, which went into effect in 1830, and at that time the ordinary mode of enforcing payment of any judgment or decree was by imprisonment, and the act abolishing imprisonment for debt went into effect the following year. This act takes away the remedy by imprisonment on civil process in suits and proceedings for the recovery of money due upon judgments or decrees founded upon contract, or due upon any contract, express or implied. Unless the judgment or decree is founded upon contract, or the money is due upon contract, express or implied, the act affords no protection, and the power to imprison remains the same as before it was passed. Here there is' a trust, and it is one of obligation and duty, and not of speculation and profit. The executor cannot mingle the trust money or property with his own/or convert it to his own use, however honest and sincere may be his purpose to restore it when wanted (Seaman v. Duryea, supra, and cases cited). In the principal case, the upright and able judge further says : “He is to hold the one and invest the other for the profit of his ward, and to have the property and money or the securities which represent the money, at all time s subject to such order as the court, from which he derives his office, may see proper to make. If the order is to deliver over the property, transfer the securities or pay the money to the ward when of age, or to the new guardian when he is not; the law assumes his ability .to do what the obligations of his duty require that he should do. and he cannot evade his responsibilities and change 'his position as a trustee into that of a mere contract debtor, by the allegation, real or pretended, that the trust property has been converted to' his own use. Section 2 of the non-imprisonment act declares that the provisions shall not extend to con- *238 tempts to enforce civil remedies, and the act of May 9, 1846 (Laws of 1846, p. 164), provides that in actions upon contracts for moneys received by male persons in a fiduciary capacity, the defendants ‘ shall be liable to imprisonment in the same manner as in actions for wrongs.’ These several enactments indicate no disposition to relax the law of imprisonment in regard to trustees made liable for trust property.” This ease was afterward reviewed in the court of appeals (11 N. Y. [1 Kern.], 324), and the decision of Judge Brown, at special term, holding that the attachment had been properly issued and the defaulting guardian properly imprisoned, was affirmed with but one dissenting voice.
The case of Hosack v. Rogers (11 Paige, 603), is relied upon by the executor’s' counsel, to show that an attachment cannot be issued, and the same case is referréd to in the Matter of Watson as sustaining the doctrine of that case, but I apprehend it is not in point. The suit was to recover a debt on contract, and a decree fixing the amount of such indebtedness was made, and the chancellor very properly decided that he could riot enforce it by attachment.
In the case of Doran v. Dempsey (1 Bradf., 490), also relied upon in the Matter of Watson, the learned surrogate does not attempt to decide that in such a case surrogates have no power to issue attachments ; but simply determines that he will not do it in that case. In Saltus v. Saltus (2 Lans., 9), the case of Doran v. Dempsey is merely referred to, but neither approved nor disapproved, but the power of the surrogate to issue an attachment is distinctly recognized.
It is true the process of attachment to be issued must be “ in form similar to that used by the court of chancery in analogous cases” (Rev. Stat., § 10, subd. 4, 364), but the “ analogous cases ” are those existing at the time of the adoption of the Revised Statutes in *239 1830. That the statute contemplated the process theretofore used and not thereafter to be used by the court of chancery in such cases, I think, admits of no serious doubt. By the Laws of 1813, p. 195, it will be seen that the court of chancery might enforce the performance of any decree, or obedience thereto, by execution against the body of the party against whom the decree shall have been made, which would be in the nature of a ca. sa. (Blake's Chan. Appen., p. 26). But the statute did not take away the right of the court to enforce its decrees by attachment (Hosack v. Rodgers, supra). An attachment against the body of the executors here will not only be in form, but also in substance, similar to that used by the court of chancery in such a case. And then on being brought before the court, interrogatories and answers thereto are to be filed, and if no sufficient cause to the contrary be shown, a writ or process of commitment will be issued against him. The office of an attachment is to bring the party into court to answer for some alleged dereliction of duty. It differs from arrest in that he who arresteth a man carriethhim'to a higher power to be forthwith disposed of; but he that attacheth. keepeth the party attached, and presents him in court at the day assigned, as appears by the words of the writ” (Jacob Law Dic., tit. Attach.). I think the court in the Matter of Watson, lost sight of the distinction between an attachment and a process of commitment in the attachment proceeding —the statute regulating the form of the attachment only and not of the process of commitment. The surrogate, after having issued the attachment of a form similar to that used by the court of chancery, proceeds to punish by a process adapted to the case.
The remaining point to be considered is, what is the effect of 3 Rev. Stat., § 23, 853, which declares “that when the misconduct complained of consists in the omission to perform some act or duty, which it is yet *240 in the power of the defendant to perform, he shall be imprisoned only until he shall have performed such act or duty and paid such fine,” &c. It is claimed on the part of the executor, that he has converted the trust funds to his own use, since the decree was made, and has now lost the whole, and that, therefore, having no pecuniary power to perform the duty of paying imposed by the decree, he has placed himself in a position which entitles him to escape punishment for his misconduct, and to be treated as a simple debtor of the injured party. Can this be ? Is such the object and intent of that section % It seems to me that such a construction would do violence to all our ideas of justice, and is emphatically disapproved by Justice Brown in the case of Seaman v. Duryea. If it were the law, then any executor, administrator, or guardian, by taking the fund held in his fiduciary capacity and using it to pay his own debts, may escape pünishment by coming into court and showing that he has not the pecuniary power to perform the act of paying, enjoined by the decree. It is an old and sound maxim that no one shall be permitted to take advantage of his own wrong. It strikes me, that the section under consideration applies only to those cases where it is physically impossible to perform the act or duty, as where the decree directs the delivery of specific things, which have perished or been destroyed, and the like, and not to the mere direction for the payment of money. I am strengthened in this view, by the amendment of section 20 of the statute in 1843, which adds thereto these words : “But in all cases which have arisen or may hereafter arise under the provisions of this title, the court or tribunal ordering such imprisonment may, in their discretion (in cases of inability to perform the requirements imposed), relieve the person or persons so imprisoned, in such manner and upon such terms as they shall deem just and proper.” In section 23 the words *241 are “power, &c., to perform,” and in the above amendment "inability to perform.”
Before the adoption of this amendment, it seems to have been held that the only mode by which a party could be relieved from imprisonment for contempt in not paying a sum of money ordered by the court to be paid, was by an appeal to the pardoning power (People v. Bennett, 4 Paige, 282, or by application to the legislature ; Van Wezel v. Van Wezel, 3 Paige, 38 ; 2 Barb. Ch., 281).
The executor had ail the money, amounting to thirty-five thousand eight hundred and forty-four dollars and seventy-nine cents, in his hands at the time the decree in this matter was entered. He retained as belonging to him, and paid out thirty-one thousand eight hundred and three dollars and eighty-one cents to various devisees, leaving in his hands four thousand and forty dollars and ninety-eight cents, as the share of John C. Timpson, the petitioner, whom he represents that he could not find. This fund he converted to his own use, and the whole is lost. In this he was clearly guilty of misconduct which £ 6 was calculated to, or actually did defeat, impair, impede or prejudice the rights or remedies” of said John 0. Timpson, in a matter depending, in this court, and is thus clearly brought within the provisions of section 20, which authorizes the court to impose a fine or to imprison him, or both, and after-wards the court may relieve him from imprisonment on becoming satisfied of his inability to pay. The statute as thus amended furnishes a perfect scheme for- the-adequate punishment of such delinquents, and for their relief and ultimate discharge in proper cases. It would be strange, indeed, if legislative wisdom had failed to furnish appropriate methods to punish those guilty of breaches of trust—an offense in these days of so frequent occurrence and so alarming in amounts involved. -
*242 It is with much diffidence that I find myself obliged to disregard certain dicta of the learned justice who delivered the opinion of the court in the Matter of Watson, but the case of Seaman v. Duryea, and a careful examination of the statutes and authorities, leaves me no alternative.
A precept must, therefore, be issued, directing the sheriff of Westchester county to take into his custody the person of the executor, and so keep him until the further order of the court.