Coffin, Surrogate.
In granting the order for the writ of commitment to close custody as for a contempt, I was following the views I expressed in Timpson’s Estate (15 Abb. Pr. N. S. 235). The power claimed, in that case to exist in surrogates’ courts, to imprison, hinged mainly upon the fact that certain sections of the chapter of the Revised Statutes relating to con-tempts, applied only to courts of record, among which these courts were not classed. Since then, however, *382 and shortly prior to the granting -of the order of the special term dismissing the appeal, surrogates’ courts have, by an act of the last session of the legislature, which went into effect on the first day of September last, become courts of record. Does this fact, in any way, affect the pending proceeding % The order, granting the writ of commitment to close custody, imposed a fine of $100 by way of costs, and was entered in July last, and proceedings under it were suspended, by reason of the appeal, which was subsequently dismissed.
The general rule is that no statute is to have a retrospect beyond the time of its commencement (6 Bac. Abr. 370.) Blackstone treats it as a first principié, that all laws are to commence in futuro, and operate prospectively (1 Comm. 44). Kent, Ch. J., in the case of Dash v. Van Kleeck (7 Johns. 477), tersely declares that the very essence of a new law is a rule for future cases. The doctrine has been sanctioned by the court of appeals in Sanford v. Bennett (24 N. Y. 20), and is the present rule, unless the new enactment be made retrospective. To hold otherwise would be to deprive the party in this matter of a remedy as well as of his costs of the proceeding.
The second section of the new Code of Civil Procedure makes a surrogate’s court in each county a court of record ; and enumerates the other courts of record ; the third section enumerates the courts not of record; and the fourth section is as follows: “Each of those'courts shall continue to exercise the jurisdiction and powers now vested in it by law, according to the course and practice of the court, except1 as otherwise provided in this act. Then follows article second, which defines what are contempts, and prescribes the mode of punishment. I find nowhere any provision making the act retrospective, so far as the question in this matter is involved; and consequently no valid *383 objection to issuing the writ, by reason of this court having become of record since the order was granted, exists.
Since such order was entered, however, my attention has been called to a manuscript opinion of Judge B aballo, in the case of Watson v. Nelson, delivered as the opinion of the court of appeals, as yet unreported.* The opinion in that case, delivered at special term of the supreme court, was disregarded as to some of its dicta in Timpson’s Estate, supra, for reasons there stated. I have carefully read the copy opinion of the learned judge, and, if correctly transcribed, fail to discover, from his reasoning, any error committed in the case of Timpson. In the latter, Timpson had the fund in his possession when the decree directing its payment by him was entered, and subsequently squandered or lost it. In the manuscript opinion referred to, it is stated, “It does not appear that this payment was decreed to be made out of any particular fund under th,e control of the respondent.” And again: “ That he is liable to attachment and imprisonment, for a debt of this nature, is not denied, but whether his failure to pay it is a contempt for which a surrogate is authorized to impose a fine and commit him to close custody for non-payment thereof , is the question now before us.” It will, therefore, be seen that the case was unlike that of Timpson, as well as of that now under consideration, as in neither of the latter was the order to commit to close custody based upon the non-payment of a fine imposed, but upon the neglect and refusal to pay the sum decreed to be paid, and which was under his control when the decree was made. In this matter a small fine of $100 was imposed under 2 R. S. 538, § 23, by way of indemnifying the moving party for his costs.
*384 Judge Bapallo, after referring to-the various provisions of the Bevised Statutes, on the subject, de-, dares that ii Generally the proceedings for enforcing decrees and process are declared to be similar to those used in the court of chancery in analogous cases.” I must confess my inability to find, in any of the provisions -of the statutes relating to this question, more than one single allusion to the court of chancery.; and that is in 2 R. S. 221, § 6, subd. 4, cited by the learned judge; which provides that the surrogate shall have power to enforce all lawful orders, process and decrees by attachment; “which attachment shall be in form similar to that used by the court of chancery in analogous cases.” How this plain language can be construed into a general declaration that the proceedings for enforcing decrees and process shall be similar to those used in the court of chancery in analogous cases; I am at a loss to comprehend (Seaman v. Duryea, 11 N. Y. 324, and cases cited). Clearly, the statute prescribes the form of the attachment, only. Had it declared that the whole proceeding should be governed by the practice of the court of chancery in such cases, then, doubtless, the power to commit to close custody would, with a few exceptions, be gone. We can only judge of the intention of our law-makers by the fair and reasonable construction of the language used to express such intention. It is quite apparent that they intended to limit the powers of the court of chancery in this respect, and to leave it in surrogates’ courts as it had existed formerly in the higher court. For, while the chancellor, after the establishing of these inferior tribunals, had concurren); jurisdiction with them in all matters of accounting and settlements of estates, yet he refused to exercise it save in exceptional cases. Hence, almost the exclusive control of such matters was devolved upon the surrogates. They were burdened with the responsibility of guard *385 ing the funds of the widow and the orphan, against the rapacity of those entrusted with their care, and it seems to me that the power to punish those violating such trusts, in some summary and severe manner, was well bestowed upon them.
The ecclesiastical courts which pursued the course of the civil law, could formerly punish disobedience to its sentences only by excommunication ; but here the common law came to their aid, and if, within forty days after publication of the sentence, the offender did not submit and abide by the sentence, the contempt was certified to the king in chancery, when a writ, called a signifcavit, was issued to the sheriff of the county, upon which the offender was taken and imprisoned in the county jail, till he was reconciled to the church (3 Bl. Comm. 101, 102).
The highest of these courts, having original jurisdiction, was the prerogative court, from which appeals lay to the king in chancery. (Id. 65). The colonial governors in this colony were clothed with the powers of the prerogative court (Brick’s estate, 15 Abb. Pr. 12). These powers were, after the revolution, lodged in a tribunal known as the court of probates (1 Laws of N. Y. [Jones & Varick’s ed.] 23). Each county was to be provided with a surrogate, from whose determination appeals might be taken to the court of probates, until the court of chancery was substituted in its place. In 1801 it was, by an act of the legislature, expressly provided that if any person should neglect, or refuse to perform any sentence or decree directing payment of distributive shares or legacies, the surrogate should have power to cause such person to be taken and imprisoned, until he should perform the same. In 1802 it was also provided that the court of chancery might enforce obedience to, or performance of any of its decrees, by execution, either against the body, or the goods and chattels of the party required to perform the *386 same. These several provisions are embodied in the revised laws of 1813 (1 R. L. 444, XI. XII. 487, IV.). This was a new power granted to the court of chancery, as, previous to 1802, it had power, to proceed only by process of attachment and to punish as for a contempt; but it did not take away the latter power. The act to abolish imprisonment for debt prohibited the arrest, or imprisonment of any person, on an execution issuing out of the court of chancery, in a suit or proceeding instituted for the recovery of money due upon any judgment, or decree founded upon contract (1 R. S. 2 ed. 807). The same act exempts proceedings for contempt to enforce civil remedies from the operations of the provisions of the first section, and the case of a trustee, who willfully retained the possession of a fund which was still in his hands, in contempt of the authority of the court, would not be within the mischief which the first section of the act was intended to remedy (Hosack v. Rogers, 11 Paige, 603). That act, however, does not apply to the class of cases usually cognizable in surrogate’s courts. It has no reference to such decrees as relate to the payment of legacies and distributive shares ; nor would it apply to such decrees made by the chancellor. His court, however, being a court of record, was, after the Revised Statutes went into effect, in all respects governed and controlled by the chapter thereof relating to contempts.
The section relating to the enforcement of decrees by surrogates, already referred to, did not, it is true, point out the mode of procedure to punish disobedience, otherwise than to declare that they should do so by attachment, and to prescribe the form of the attachment to be used. The legislature, doubtless, supposed that the court was thus clothed with sufficient power to enforce its decrees in the manner it had been authorized. to do by previous legislation; but, perhaps, because the mode of proceeding had not been clearly in *387 dicated, in 1837 it passed an act, making certain sections only, of the chapter relating to contempts, applicable to those courts, and thus prescribed precisely what should be done in such cases, and enabled them to imprison those willfully disobeying their decrees in that regard. The chapter relating to surrogates’ courts, and that relating to contempts, were adopted at the same time. Clearly, the latter furnished the rule of action to the court of chancery, and if chancery furnished the rule to surrogates, it is a matter of some wonder and surprise why the legislature should have passed the act of 1837, making certain sections only applicable to the latter.
On the whole, I am satisfied, from a review of the history of, and the legislation relating to these courts, in so far as my researches have extended, that from the days when ecclesiastics presided over them, down to our own day, they have always possessed, directly or indirectly, the power to punish parties by imprisonment who have disobeyed their decrees directing the payment of legacies or distributive shares, and that, too, without regard to whether they had the money under their control or not, and without reference to the power, in this respect, possessed by the court of chancery.
True, the power was and is liable to abuse, but the greater evil is the wrong and robbery which might otherwise result. I deprecate the effect of legislation tending to make execution against property the only remedy.
I make these remarks, because certain views expressed in the opinion delivered in the court of appeals would seem to lead to the conclusion that in no case can a defaulting or embezzling executor or adminstrator, unless he have the fund in his hands, or under his control, be committed to close custody. In other words, if he have it, he may be imprisoned ; if he have squandered it, he may go free. It was there stated *388 that the question before the court was, whether the executor’s failure to pay a debt of that nature “is a contempt, for which a surrogate is authorized to impose a fine, and commit him to close custody for non-payment thereof.” Hence, any dicta in the opinion in that case, not bearing upon the question, should be regarded as obiter. It is there declared that the proper process to have been issued by the surrogate in that case was an execution against the body. I must confess my utter inability to find any statute conferring such power, prior to the new Code above referred to, however that shall be construed.
The case of Seaman v. Duryea (10 Barb. 523) seems to me an authority establishing the power of surrogates to punish by commitment to close custody in cases where it does not appear that the fund is not in the hands, or under the control, of the party ordered by the decree to pay it. Seaman sued Duryea and others to recover damages for alleged false imprisonment. The defendants alleged, by way of justification, that the imprisonment complained of was for a contempt in disobeying a decree of the surrogate, directing the payment by the plaintiff, as late guardian of a minor, to his successor, of the sum of $427 due to said minor. It was not alleged in the answer that at the date of the decree he had the funds in his hands, or under his control. The plaintiff demurred to the answer, as not setting up facts constituting a defense. Judge Bbowst, at special term, overruled the demurrer, thus holding such facts to be a complete defense. The court of appeals affirmed the decision (11 N. Y. 324), declaring that in such a case the surrogate had a right to punish as for a contempt by imprisonment.
In People ex rel. Crouse v. Cowles (3 Abb. Ct. App. Dec. 507), approved in Watson v. Wilson, we have an authority justifying a commitment to close custody in the case under discussion.
*389 It may savor somewhat of temerity to thus criticise the decision of so august a tribunal, but in search of truth, and the correct interpretation of statutes, explorations in any direction are, when conducted in a respectful and deferential spirit, justifiable. I think the court only intended, in Watson v. Wilson, to determine the question so declared to be presented for its consideration, and not that the writ of commitment was unauthorized, because the executor was decreed to pay generally, when it did not appear that he had the fund in his hands or under his control.
I had occasion to express the view that a fine could not be imposed to the extent of the amount decreed to be paid, as no ££ actual loss or injury ” had been incurred, such as is contemplated by 2 R. S. 538, § 21, when this application was presented to me in the first instance (Hitchcock v. Marshall, ante).
If the court in Watson v. Wilson had based its decision as to the want of power in the surrogate to punish by commitment for non-payment of a fine imposed for upwards of $5,000, upon the fact that no ££ actual loss or injury ” to that extent had been shown to have been incurred, I should fail to find any reason to question its correctness.
Here, it will be observed, thfe administrator admits he has the funds in his hands which he was directed to pay, and refused, for reasons held insufficient, to pay it. No fine, to the amount of the fund, was imposed on him. Hence, the case of Watson v. Wilson does not appear to be an authority against the issuing of a writ of commitment to close custody in this case.
, Ordered accordingly.

 Since reported in 69 N. Y. 536; affi’g 5 Lans. 466, and 3 Id. 408.