KINGS COUNTY.—HON. W. L. LIVINGSTON, SURRO-
GATE.—September, 1882.

## TERRY V. BALE.

*In the matter of the judicial settlement of the account of* JAMES BALE, JR., *as an executor of the will of* JOSE-PHINE BALE, *deceased.*

An executor who takes no estate, under the will, in testator's real property, cannot be called to account in the Surrogate's court, in his capacity as executor, for rents of such property collected by him.

A trustee cannot apply a trust fund to the payment of his own claim against the *cestui que trust*, for which he has no lien on the fund, which is in no way connected with the execution of the trust, and the payment of which is not provided for by the terms of the trust.

As between near relatives, board furnished and services rendered do not raise an implied promise to pay therefor, as in the case of strangers.

Where there is no other evidence of a conversion than a demand and re-

fusal, the statute of limitations does not begin to run until the refusal, although the conversion may have taken place long before.

In 1842, the father of the accounting executor, B., opened an account in a savings bank, in his own name, "in trust for B.," then an infant. In 1851, the father died, leaving a will of which his widow, B.'s mother, qualified as executrix. She, as executrix, drew out the entire amount on deposit, amounting to over $700, and never accounted therefor. Upon B.'s accounting as her executor, he made a claim for this amount against her estate. It appeared that he had never authorized testatrix to draw these moneys, and never during her lifetime knew of their being lost to him; that he resided with his mother until his marriage, and afterwards hired rooms from her. Objectors contended that the executor's claim was barred by the statute of limitations; also that testatrix had expended the entire fund in paying herself the amount due her from B. for support and rent.—*Held,*

1. That, on the death of B.'s father, the latter's rights as trustee of the fund in bank devolved upon his executrix.

2. That she had no right to apply it in payment of a disputed claim on her part against the *cestui que trust.*

3. That, B. not having had any knowledge of the loss of the fund until after testatrix's death, the statute of limitations did not begin to run until that event occurred.

4. That testatrix's estate might be credited with the interest on the fund accruing between the death of B.'s father and the majority of B., as having been applied to his support.

5. That testatrix's estate must be charged, in B.'s favor, with the principal of the fund, and interest thereon from his majority, at six per cent., with annual rests, deducting her commissions.

JUDICIAL settlement of executor's account. Objections were filed by Josephine Terry, Sarah E. Moore, and Adeline Baschold, next of kin of decedent. The facts appear sufficiently in the opinion.

SAMUEL T. MADDOX, *for the executor.*

GEORGE H. FISHER, *for objectors.*

THE SURROGATE.—The executor does not charge himself with any personal property belonging to the deceased, although she left some household furniture; but the account relates exclusively to the rents from the real estate.

The executor testifies that he divided the personal property in accordance with the will, and the contestants are, no doubt, satisfied with the division, as they do not claim that the executor came into possession of personal property for which he has not accounted; but they insist that he had no authority to collect the said rents.

It does not appear that the executor took a legal estate in the real property under the will; consequently, the said rents were not collected by him in his capacity of executor, and his account as to them is not to be settled in this court.

The main contention, however, is as to the executor's claim against the estate.

It appears that the executor's father, in the year 1842, opened an account in the Bowery Savings Bank, in the city of New York, in his name, "in trust for James Bale, Jr.," and that, from time to time, he deposited money to the credit of said account, so that, up to July, 1851, the fund in bank, including interest, amounted to $705.60. When Mr. Bale, Sr., died, in October, 1851, the fund was a trifle larger than that, by reason of the interest accrued from July, 1851, to the date of Mr. Bale's death.

In 1848, James Bale, Sr., opened another account in the Seamen's Savings Bank, in the city of New York, in his name, "in trust for James Bale, Jr." The balance to the credit of this account, at the time of Mr. Bale's death, in October, 1851, with interest, amounted to over $1,247.11. At the time of his father's death, James Bale, Jr., was an infant about fifteen years of age. On October 25th, 1852, he went with his mother to the Seamen's Savings Bank and signed an order authorizing the bank to pay her all or any part of the money to his credit in said account.

The whole amount was drawn out by Mrs. Josephine Bale, in several sums; what use she made of the money is not disclosed by the evidence. No claim is made by James Bale, Jr., for any part of the money so drawn. But after the death of her husband, Mrs. Josephine Bale, as the executrix of his will, drew from the Bowery Savings Bank the amount on deposit there, in trust for her son, James Bale, Jr.; and he swears that he never authorized her to draw it, and never assented to her doing so.

It is for this money, so drawn from the Bowery Savings Bank by Mrs. Josephine Bale, that the claim is made against her estate. By opening the account in the Bowery Savings Bank, in the manner above stated, James Bale, Sr., constituted himself trustee for James Bale, Jr., and all the money deposited to the credit of that account became trust funds, held by said trustee for the benefit of said *cestui que trust* (Martin v. Funk, *75 N. Y., 134*). When James Bale, Sr., died, his rights as trustee of said fund devolved upon his executrix, Josephine Bale (Boone v. Citizens' Sav. Bank, *84 N. Y., 83, 87*). As early as October, 1852, she had drawn all the money from the bank; what she did with it does not appear, but none of it was left on hand at the time of her death.

The contestants claim that the money was given by James Bale, Jr., to his mother; but the only evidence to that effect is the testimony of Mrs. Baschold that her brother, James Bale, Jr., told her so in the presence of his wife; this is denied by both James and his wife, and it may well be that the remarks testified to by Mrs. Baschold were made by James in reference to the fund in the Seamen's Savings Bank, which, as we have seen, he

did give to his mother, and that Mrs. Baschold is mistaken when she says that they applied to the money in the Bowery Savings Bank.

Until James Bale, Jr., was married in 1859, he lived with his mother, and after his marriage he rented rooms from her. The contestants suggest that his mother used up the whole fund in paying herself the amount which they claim was due to her by James Bale, Jr., for his support and maintenance and for rent. James Bale, Jr., denies that he owed his mother anything; but supposing he did, she had no right to apply the trust fund in payment of a disputed debt, claimed to be due to herself for which she had no lien on the trust fund; which was in no way connected with the execution of the trust; and the payment of which was not provided for by the terms of the trust (Henry v. Fowler, *3 Daly, 199;* Hill on Trustees, *574;* Perry on Trustees, § *863*). While James Bale, Jr., was an infant, if he did not earn enough to support himself, as it is probable from the evidence that he did not, his mother was authorized to apply the income of the trust fund to that purpose, and it may now be assumed that such income, accruing from the time of the death of James Bale, Sr., until James Bale, Jr., attained his majority, was applied to his support and maintenance (Hill on Trustees, *402*); but no part of the principal could be properly so applied without the sanction of the court (Hill on Trustees, *399;* Story Eq. Jur., § *1355;* Willcox v. Smith, *26 Barb., 353;* Dayton on Surr., *2d ed., 634*). Much less could she use up the trust fund in supporting the *cestui que trust* after he became of age, and while he was not laboring under any disability (Perry on Trustees, § *915*). Assuming that Mrs. Josephine Bale had the right

to apply the trust fund in the manner claimed by the contestants, it cannot be said that the alleged claim against James Bale, Jr., has been proved. It is true that, after he became of age, he continued to live with his mother until he was married, and that, after his marriage he hired rooms from her; but he says that, while he was living with her, he gave her all his earnings; that he worked for her in supplying customers with milk; that he did not owe her anything for his support; and paid her all the rent he owed her. It does not appear on what terms he was living in his mother's family; whether it was to pay board, or give his earnings and services to his mother for his board. No express contract to pay board was proved, and between near relatives board furnished and services rendered do not raise an implied promise to pay for the same, as in the case of strangers (Bowen v. Bowen, *2 Bradf., 336;* Matter of Kelly, *1 Tucker, 28;* Williams v. Hutchinson, *3 N. Y., 312;* Keller v. Stuck, *4 Redf., 294*). Bale had given his mother twelve hundred dollars, and she may have been willing to help him along when he was out of work without expecting to be paid for it; indeed, the evidence is to that effect. Mrs. Baschold, his sister, testified that she had heard her mother say that he ought to be a help to her—instead of that, *she had to help him;* and also that she had *given* him rent. These declarations of Mrs. Bale are not evidence, against her son, of the facts stated, but they tend to prove that, if such assistance was given, it was gratuitous.

The contestants also insist that the executor's claim is barred by the statute of limitations. It must be remembered that the executor is a *cestui que trust* claiming the

trust fund from the trustee. No time was fixed when the trust was to cease. It was not ended by payment of the trust fund to the *cestui que trust.* There was no demand and refusal to pay the fund over. Neither had any claim been made by the trustee, to the trust fund, in opposition to her trust. As has been said before, it is not known what became of the trust fund; but it disappeared. Now, assuming that the statute would begin to run against the *cestui que trust* from the time that this disappearance of the fund came to his knowledge, provided he was then of age, it is not proved that he had any such knowledge until after his mother's death. He swears that he did not know of the account in the Bowery Savings Bank until several months after his mother's death; but there is one part of his testimony which, if it be not a mistake, is inconsistent with that statement.

Q. Don't you know that your mother drew, on the 29th of November, 1851, $300?

A. No, sir; I didn't know that my mother drew a dollar from the Bowery Savings Bank, until I saw these vouchers, and I did not believe it *when my mother told me she drew it.*

Viewing the testimony in the least favorable light to the executor, it still does not appear that he ever had any knowledge, before his mother's death, that the money in the Bowery Savings Bank had been lost to him. She told him that she had drawn the money from the bank; but there is no evidence that she told him that she had lost it, or disposed of it in violation of the trust, or, in fact, what she had done with it. Moreover, there is no evidence as to when the trust fund disappeared, except that it must have been before the death of the trus-

tee; and for that reason the statute of limitations could not begin to run until that event happened, on the same principle that, where there is no other evidence of a conversion than a demand and refusal, the statute will not begin to run until the date of the refusal, although the conversion may have taken place long before (Kelsey v. Griswold, *6 Barb.*, *441*).

The defence of the statute of limitations is, therefore, not sustained (Hill on Trustees *264;* Story's Eq. Jur., §§ *1273 e*, *1520 a;* Purdy v. Sistare, *2 Hun*, *126*; Neilly v. Neilly, *23 Hun*, *651*).

The alleged claim against James Bale, Jr., is not set forth in the objections as a counterclaim made against him, but, considering it in that light, it is sufficient to say that so much of it as relates to his support and maintenance before he was married has not been sufficiently proved, and is, moreover, barred by the statute of limitations, if it ever was valid; as to the rent claimed to be due by him after his marriage, the proof is so vague and indefinite that it does not appear when the claim arose, and it cannot, therefore, be said to be barred by the statute of limitations; but Bale swears he gave the rent for each month to his wife to pay to his mother, and Mrs. Bale swears that she paid it to the deceased. Bale also testified, on cross-examination, as follows:

Q. When was the last time you paid her (Mrs. Bale) rent?

A. Mother died on the 9th of January, and I took my rent up on the 7th or 8th of January, and my brother took charge of it.

Q. Then you did pay rent within two days of your mother's death?

A. Yes, sir.

Q. What were you paying at the time of your mother's death, or the two months before that?

A. I think it was $16 or $17.

Taken in connection with Bale's other testimony, he must be understood as saying that the payments he speaks of 'were made and accepted for the rents then accruing, and the presumption in such a case is that all the rent previously due had been paid (Decker v. Livingston, *15 Johns., 479*). Admitting, as claimed by contestants, that Bale was without work about half of the time, it would not prove that, when he was employed, he did not earn enough to pay his rent, and if his mother chose to help him; and occasionally give him a month's rent, he would not be indebted to her for any gift she made to him. Upon the evidence, it must be held that Bale paid his mother all the rent he owed her.

No part of the trust fund was paid to the *cestui que trust,* and, at the death of the trustee, it could not be found on hand properly invested, as it should have been; nor could any account or trace of it be found. The estate of the trustee must, therefore, be held liable for it, and the *cestui que trust* is entitled to receive what would have come to him if the trustee had properly discharged her trust (King v. Talbot, *40 N. Y., 92*).

The trust fund, at the death of James Bale, Sr., amounted to $705.60, and the proportion of interest accruing from July, 1852, to the date of his death. Mrs. Josephine Bale, as has been said before, may be credited with the interest accruing from the death of James Bale, Sr., until her son attained his majority, as having been applied to his support and maintenance during that time.

As none of the interest accruing on the trust fund after the *cestui que trust* became of age was paid to him, it was the duty of the trustee to invest the same. Under the rule laid down in King v. Talbot (*supra*), she must, therefore, be charged with interest at the rate of six per cent. per annum, with annual rests. She is, of course, to be credited with the amount of her commissions (King v. Talbot, *supra*).

Decreed accordingly.